UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL LABOR RELATIONS BOARD,

                Applicant,

      vs.

MCDONALD'S USA, LLC

                Respondent.

No.  1:15-mc-00322-P1

## MCDONALD'S USA, LLC'S OPPOSITION TO APPLICATION FOR AN ORDER ENFORCING ADMINISTRATIVE SUBPOENA DUCES TECUM B-1-L39K3Z

Willis J. Goldsmith
Doreen S. Davis (*pro hac vice* pending)
Ian Samuel
Joshua Grossman
JONES DAY
222 East 41st Street
New York, New York 10017
Tel: 212.326.3939
Fax: 212.755.7306
wgoldsmith@jonesday.com
ddavis@jonesday.com
isamuel@jonesday.com
jgrossman@jonesday.com

Jonathan M. Linas (*pro hac vice* pending)
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601
Tel: 312.269.4245
Fax: 312.782.8585
jlinas@jonesday.com

*Attorneys for McDonald's USA, LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND .................................................................................................3

    I.     The General Counsel's Investigation and Complaint .............................3

    II.    The Proceedings (and Irregularities) Thus Far.......................................5

    III.   The General Counsel's Subpoenas .........................................................7

ARGUMENT.....................................................................................................10

        A.    The Number of Document Custodians ..........................................12

            1.    Courts Rightly Deny Disproportionate and Unreasonable Requests to Expand ESI Custodian Searches ...................................12

            2.    The General Counsel's Request That McDonald's Triple The Number Of ESI Custodians Is Disproportionate and Unreasonably Burdensome ..................................................13

        B.    Documents That McDonald's Does Not Possess .........................18

            1.    The General Counsel's Demand for McDonald's To Create ISP Reports ............................................................18

            2.    The General Counsel's Demand For McDonald's To Create R2D2 Reports ..........................................................20

            3.    Aon/Franke Records .........................................................22

        C.    Redaction of Documents ..............................................................25

            1.    Information That is Not Responsive ..................................25

            2.    Information That Is Sensitive And Irrelevant....................27

CONCLUSION..................................................................................................29

# TABLE OF AUTHORITIES

Page

CASES

*Abbott v. Lockheed Martin Corp.*,
No. 06-cv-701, 2009 WL 511866 (S.D. Ill. Feb. 27, 2009) ................................................27

*Alexander Interactive, Inc. v. Adorama, Inc.*,
No. 12-cv-6608, 2014 WL 61472 (S.D.N.Y. Jan. 6, 2014) ................................................23

*Alexander v. FBI*,
194 F.R.D. 305 (D.D.C. 2000) .................................................................................... 19, 21

*Anthropologie, Inc. v. Forever 21, Inc.*,
No. 07-cv-7873, 2009 WL 690126 (S.D.N.Y. Mar. 13, 2009) ..........................................25

*Ash v. Anderson Merchandisers*,
No. 14-3258, 2015 WL 4978701 (8th Cir. 2015) ..............................................................6

*Bagley v. Yale Univ.*,
307 F.R.D. 59 (D. Conn. 2015) .......................................................................................13

*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*,
No. 93-cv-5298, 1997 WL 563792 (S.D.N.Y. Sept. 10, 1997) ..........................................25

*BFI Newbery Island Recyclery*, 362 NLRB No. 186 (2015) ...........................................4, 28

*Byers v. Illinois State Police*,
No. 99-cv-8105, 2002 WL 1264004 (N.D. Ill. June 3, 2002) ............................................12

*Conti v. U.S. Dep't of Homeland Sec.*,
No. 12-cv-5827, 2014 WL 1274517 (S.D.N.Y. Mar. 24, 2014) ........................................25

*D.R. Horton, Inc. v. NLRB*,
737 F.3d 344 (5th Cir. 2013) ............................................................................................7

*DCG Systems, Inc. v. Checkpoint Techs, LLC*,
No. 11-3792, 2011 WL 5244356 (N.D. Cal. 2011) ..........................................................13

*Diak v. Dwyer, Costello & Knox, P.C.*,
33 F.3d 809 (7th Cir. 1994) ............................................................................................27

*EEOC v. Kronos Inc.*,
620 F.3d 287 (3d Cir. 2010) ........................................................................... 11

*EEOC v. Kronos Inc.*,
694 F.3d 351 (3d Cir. 2012) ........................................................................... 11

*EEOC v. Morgan Stanley & Co.*,
132 F. Supp. 2d 146 (S.D.N.Y. 2000) ........................................................... 22

*Emhart Indus., Hartford Div. v. NLRB.*,
907 F.2d 372 (2d Cir. 1990) ....................................................................... 1, 7

*Golden Trade, S.r.L. v. Lee Apparel Co.*,
143 F.R.D. 514 (S.D.N.Y. 1992) ................................................................... 24

*In re eBay Seller Antitrust Litigation*,
No. 07-1882, 2009 WL 3613511 (N.D. Cal. Oct. 28, 2009) ......................... 22

*In re Flag Telecom Holdings, Ltd.*,
236 F.R.D. 177 (S.D.N.Y. 2006) ............................................................... 23-24

*In re Ford Motor Co.*,
345 F.3d 1315 (11th Cir. 2003) ............................................................... 12-13

*In re Morgan Stanley Pass-Through Certificates Litig.*,
No. 09-cv-2137, 2013 WL 4838796 (S.D.N.Y. Sept. 11, 2013) ............... 13, 17

*In re NTL, Inc. Sec. Litig.*,
244 F.R.D. 179 (S.D.N.Y. 2007) ................................................................... 24

*Indep. Elec. Contractors, Inc. v. NLRB*,
720 F.3d 543 (5th Cir. 2013) .......................................................................... 7

*Jinks-Ustead v. England*,
227 F.R.D. 143 (D.D.C. 2005) ....................................................................... 22

*Kingsway Fin. Servs., Inc. v. Pricewaterhouse Coopers LLP*,
No. 03-cv-5560, 2007 WL 473726 (S.D.N.Y. Feb. 14, 2007) ...................... 25

*Local 777 v. NLRB*,
603 F.2d 862 (D.C. Cir. 1978) ........................................................................ 7

*Love's Barbecue Rest.*,
245 NLRB 78 (1979) ........................................................................................ 4

*McDonald's USA, LLC & Service Employees International Union, et al.,*
    362 NLRB No. 168 (NLRB Aug. 14, 2015) ................................................................. 5, 7

*McNabb v. City of Overland Park,*
    No. 12-cv-2331, 2014 WL 1152958 (D. Kan. Mar. 21, 2014) ........................................ 25

*Mosley v. General Motors Corp.,*
    497 F.2d 1330 (8th Cir. 1974) ....................................................................................... 6

*New Amsterdam Capital Partners, LLC v. Wilson,*
    No. 11-cv-9716, 2013 WL 1874586 (S.D.N.Y. May 1, 2013) ...................................... 27

*NLRB v. American Medical Response, Inc.,*
    438 F.3d 188 (2d Cir. 2006) ......................................................................................... 10

*NLRB v. Atl. Veal & Lamb, Inc.,*
    548 Fed.Appx. 657 (2d Cir. 2013) ................................................................................. 7

*NLRB v. Champagne Drywall, Inc.,*
    502 F. Supp.2d 179 (D. Mass. 2007) ........................................................................... 22

*NLRB v. Cudahy Packing Co.,*
    34 F. Supp. 53 (D. Kan. 1940) ..................................................................................... 10

*NLRB v. Detroit Newspapers,*
    185 F.3d 602 (6th Cir. 1999) ........................................................................................ 10

*NLRB v. Interbake Foods,*
    637 F.3d 492 (4th Cir. 2011) ........................................................................................ 10

*NLRB v. Starbucks Corp.,*
    679 F.3d 70 (2d Cir. 2012) ............................................................................................ 7

*NLRB v. UPMC Presbyterian Shadyside,* Nos. 14-mc-109, 14-mc-110, 14-mc-11, 2014
    WL 4348180 (W. D. Pa. Sept. 2, 2014) ....................................................................... 11

*Orion Power Midwest, L.P.,* No. 05-cv-555, 2008 WL 4462301 (W.D. Pa. Sept. 30,
    2008) ............................................................................................................................. 25

*Patterson v. Domino's Pizza, LLC,*
    333 P.3d 723 (Cal. 2014) ............................................................................................... 4

*Powerhouse Marks, LLC v. Chi Hsin Impex, Inc.,*
    No. 04-cv-73923, 2006 WL 83477 (E.D. Mich. Jan. 12, 2006) .................................. 22

*Precision Castings Co. v. Boland,*
13 F. Supp. 877 (W.D.N.Y. 1936) ...........................................................................10

*SDBC Holdings, Inc. v. NLRB,*
711 F.3d 281 (2d Cir. 2013) ......................................................................................7

*Sentry Ins. A Mut. Co. v. Brand Mgmt. Inc.,*
No. 10-cv-347, 2012 WL 6617357 (E.D.N.Y. Dec. 19, 2012) ........................27

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.,*
490 F.3d 130 (2d Cir. 2007) ....................................................................................23

*Soetaert v. Kansas City Coca Cola Bottling Co.,*
16 F.R.D. 1 (W. D. Mo. 1954)................................................................................20

*Spaeth v. Michigan State Univ. College of Law,*
845 F. Supp. 2d 48 (D.D.C. 2012) ...........................................................................6

*United States v. Gangi,*
No. 97-cr-1215, 1998 WL 226196 (S.D.N.Y. May 4, 1998)..............................29

*Vasudevan Software Inc. v. Microstrategy Inc.,*
No. 11–cv–6637, 2012 WL 5637611 (N.D. Cal. Nov. 15, 2012) ....................13

*Wiwa v. Royal Dutch Petroleum Co.,*
No. 96-cv-8386, 2009 WL 529224 (S.D.N.Y. Feb. 17, 2009)...........................24

*Zubulake v. UBS Warburg LLC,*
No. 02-cv-1243, 2003 WL 22410619 (S.D.N.Y. Oct. 22, 2003) .....................12

## STATUTES

National Labor Relations Act, 29 U.S.C. §§ 151-169 ............................................*passim*

Lanham Act, 15 U.S.C. § 1051 *et seq.*........................................................................4

## OTHER AUTHORITIES

8A Wright, Miller & Marcus, Federal Practice and Procedure § 2210 (2d ed. 1994)......................19-20

Fed. R. Civ. P. 21 .......................................................................................................6

Fed. R. Civ. P. 26(b)(2)(C) .....................................................................................17

Fed. R. Civ. P. 34 ...............................................................................................20, 23

Michael Saltsman, *Wage Protests Stem From Unions, Not Grass Roots*, Las Vegas Review-Journal (April 15, 2015) .................................................................................................4

NLRB Case Handling Manual (2015) .........................................................................8, 27-28

NLRB FY2014 Performance Accountability Report, *available at* https://www.nlrb.gov/ sites/ default/files/attachments/basic-page/node-1674/13682%20NLRB%202014%20PAR%20v5%20-%20508.pdf .................................................5

NLRB "Who We Are", *available at* https://www.nlrb.gov/who-we-are ...................................................1

Sedona Principles for Elec. Document Prod. 3 (2004) ........................................................12

## INTRODUCTION

Ordinarily, cases before the National Labor Relations Board ("Board" or "NLRB")[1] do not involve pre-trial discovery. *See Emhart Indus., Hartford Div. v. NLRB.*, 907 F.2d 372, 378 (2d Cir. 1990) ("Pre-trial discovery, perhaps the primary source of delay in civil actions, is almost never allowed by the [B]oard"). For that reason, Board cases ordinarily do not involve discovery disputes. This case is different. Here, the presiding Administrative Law Judge ("ALJ") granted the Board's General Counsel – and only the General Counsel – the ability to conduct pre-trial discovery. The ALJ halted all proceedings, allowing the General Counsel to issue McDonald's USA, LLC ("McDonald's" or "Company") – and each of the 29 franchisees charged in the case – massive and wide-ranging trial subpoenas.[2] The General Counsel has gone on to adopt extreme and inflexible positions as to the scope of his subpoenas and the manner in which he believes respondents must comply. As a result, the General Counsel has now manufactured the discovery disputes before this Court, as well as disputes pending in 20 other enforcement actions against McDonald's franchisees in six different district courts across the country, in which the General Counsel seeks essentially the same documents he seeks here.[3]

McDonald's, by contrast, has overwhelmingly complied with the General Counsel's subpoena. Standing alone, the General Counsel's subpoena to McDonald's is, we believe, one of the

---

[1] The Board is "a quasi-judicial body," https://www.nlrb.gov/who-we-are, that decides cases involving the National Labor Relations Act. Its cases are heard upon complaints issued by its General Counsel. *See* 29 U.S.C. §153(d)

[2] The ALJ quashed McDonald's subpoenas, which were far more limited than the General Counsel's. *See* Order Granting the Petitions to Revoke McDonald's USA, LLC's Subpoenas *Duces Tecum* Served Upon Mintz Group, LLC, LR Hodges & Assoc., Ltd. and N.Y. Communities for Change, Inc., Ex. A to Declaration of Willis J. Goldsmith, Ex. 1; Order Granting and Denying in Part the Petitions to Revoke McDonald's USA, LLC's Subpoenas *Duces Tecum* Served Upon the Charging Parties and Kendall Fells, Ex. B to Declaration of Willis J. Goldsmith, Ex. 1; Order Granting Hart Research Assoc.'s Petition to Revoke McDonald's USA, LLC's Subpoenas *Duces Tecum*, Ex. C to Declaration of Willis J. Goldsmith, Ex. 1.

[3] *See* Case Nos. 15-mc-326 (S.D.N.Y.), 15-mc-327 (S.D.N.Y.), 15-mc-328 (S.D.N.Y.), 15-mc-329 (S.D.N.Y.), 15-mc-330 (S.D.N.Y.), 15-mc-331 (S.D.N.Y.), 15-mc-332 (S.D.N.Y.), 15-mc-333 (S.D.N.Y.), 15-mc-334 (S.D.N.Y.), 15-mc-335 (S.D.N.Y.), 15-mc-248 (C.D. Cal.), 15-mc-249 (C.D. Cal.), 15-mc-250 (C.D. Cal.), 15-mc-110 (E.D. Cal.), 15-mc-228 (E.D. Pa.), 15-mc-092 (S.D. Ind.), 15-cv-9415 (N.D. Ill.), 15-cv-9421 (N.D. Ill.), 15-cv-9427 (N.D. Ill.), 15-cv-9444 (N.D. Ill.).

most burdensome in the history of the agency.  It consists of seven single-spaced pages of instructions, followed by 118 separate demands for information.  Over 70 of the demands seek documents and electronically stored information ("ESI") relating to each of the 29 franchisees in this case, resulting in over 2,000 cumulative requests.  To date, McDonald's production – which is still ongoing – totals 17 volumes of responsive records running more than 160,000 pages and includes responsive records from 28 ESI custodians (selected through negotiation with the General Counsel), at a cost to the Company of more than $1 million (for litigation support vendors alone). *See* Declaration of  Jessica Allman, Ex. 2; Declaration of James R. Tuttle, Ex. 3.

Nevertheless, the General Counsel now demands McDonald's triple the number of document custodians from whom it will search for ESI – to nearly 90 – reneging on an agreement to limit that number, but failing to explain how the custodians McDonald's identified are insufficient or how searching additional custodians will yield new information.  In addition, the General Counsel demands McDonald's create documents for him from whole cloth, take upon itself the burden of retrieving documents from third parties, and produce everything without routine redactions.

The General Counsel's positions would be unsustainable in civil litigation; they are even less sustainable here.  The burden of production that he would impose on McDonald's is wholly disproportionate to the substantive relief at stake in the underlying Board proceeding.  Indeed, the discovery sought from McDonald's relates solely to allocating damages.  If the General Counsel were able to prove every allegation in his complaint against all respondents in the case, the remedy (based on McDonald's understanding of the claims) would be to post notices at certain of the charged franchisees' restaurants and a financial remedy of roughly $50,000 plus interest.  The General Counsel has already imposed millions of dollars of discovery costs on McDonald's (and more on the other respondents).  He now asks this Court for an order requiring McDonald's to spend millions more, in a case where the amount at stake would not suffice for federal diversity

jurisdiction.

Additionally, as noted above, the discovery the General Counsel seeks is entirely related to the allocation of damages and not relevant to substantive liability.  That is, the General Counsel hopes to fundamentally rewrite franchising and joint employment law under the National Labor Relations Act so that McDonald's, for the first time ever, would be deemed a joint employer of hundreds of thousands of people employed by its franchisees and jointly liable for the franchisees' alleged unfair labor practices.  The General Counsel's discovery requests, then, go not to whether McDonald's itself violated any law, but rather to whether the Company may be held liable as a joint employer if and when – maybe years from now – the General Counsel can prove that other companies did.  That is solely an issue of remedy – one that becomes relevant (if at all) only if the General Counsel can first prove that a party other than McDonald's actually did something wrong (and even then only if those other parties prove incapable of complying with any remedies ordered).

Moreover, McDonald's has repeatedly offered to negotiate a resolution to the discovery disputes now before this Court and remains willing to do so.  The General Counsel has said no repeatedly.  But what he has never done is articulate how (if at all) his case has benefitted from the massive discovery that he has received to date, let alone articulate a cogent theory of how the additional discovery he now demands comports with proportionality or reason.  There comes a point at which discovery must end, and here that point is well passed.  This Court should deny the General Counsel's application.

**BACKGROUND**

## I.      The General Counsel's Investigation and Complaint

Since approximately 2012, the Service Employees International Union ("SEIU") has orchestrated a highly-public campaign against the McDonald's brand, including staged protests at restaurants throughout the country and litigation against both McDonald's and various franchisees.

-3-

*See, e.g.*, Michael Saltsman, *Wage Protests Stem From Unions, Not Grass Roots*, Las Vegas Review-Journal (April 15, 2015) (quoting one SEIU organizer pledging to "bring 150 people and shut [a McDonald's franchisee's] store down, day after day"). The SEIU also flooded McDonald's franchisees with garden-variety unfair labor practice charges. Substantively, these charges are unremarkable but for the SEIU's argument that McDonald's is a joint employer of its franchisees' employees – a position that contradicts Board law dating back four decades.[4] *See, e.g.*, *Love's Barbecue Rest.*, 245 NLRB 78, 117 (1979) (rejecting the General Counsel's invitation to rewrite joint employment law to "encompass a full analysis of the financial relationship between franchisor and franchisee").[5]

In July 2014, the Board's General Counsel issued a press release[6] stating that he intended to pursue unfair labor practice claims against a number of McDonald's independent franchisees and pursue the SEIU's joint-employer theory against McDonald's. Half a year later, Regional Directors in six different NLRB regions issued separate complaints, involving 29 independent franchisees in five states (along with a single McDonald's-owned restaurant), each with its own ownership, management, supervision, and employees. The complaints alleged 181 unrelated violations of the Act. While certain complaints include a claim for back, the primary remedy sought by the General Counsel is a notice posting – a statement of employee rights under the Act – to be posted for a

---

[4] The SEIU's joint employment argument is also contrary to federal laws related to franchising and trademarks, including but not limited to the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the law of every state in the Union. *See, e.g.*, *Patterson v. Domino's Pizza, LLC*, 333 P.3d 723, 739 (Cal. 2014) (noting the "sound and legitimate reasons for business format contracts like the present one to allocate local personnel issues almost exclusively to the franchisee").

[5] Contrary to some published reports, the Board did not change its position with respect to franchisors and franchisees in its recent decision in *BFI Newbery Island Recyclery*. *See* 362 NLRB No. 186 at *24 n.120 (2015) (it is "simply wrong" to suggest that the decision "fundamentally alters the law" with respect to franchisor-franchisee relationships, noting that "[n]one of those situations are before us today").

[6] Prior to the General Counsel's press release, he investigated the SEIU's various charges for approximately 20 months. During that time period, the Company provided the General Counsel with seven statements of position and approximately 1,200 pages of documents. At no time during the investigation did the General Counsel serve McDonald's with an investigative subpoena or suggest that the Company was not cooperating with the investigation. Against that backdrop, it is disingenuous for the General Counsel to now suggest – as he repeatedly does in his papers to this Court – that his instant trial subpoena is somehow necessary for his "investigation" of McDonald's. That investigation should have been complete before the General Counsel decided to issue a press release and then complaints in this matter.

period of 90 days.  We estimate the total financial exposure, if every single allegation is proven, to be

around $50,000.  In January 2015, the six complaints were transferred to NLRB Region 2 and then

consolidated for all purposes.  *See* Consolidated Complaint, Ex. D to Declaration of Willis J.

Goldsmith, Ex. 1.

## II.      The Proceedings (and Irregularities) Thus Far

The Board proceedings thus far have been highly irregular.[7]  In fact, two of the Board's own

members have questioned whether McDonald's due process rights have been violated already.  *See*

*McDonald's USA, LLC & Service Employees International Union, et al.*, 362 NLRB No. 168, at *2 (NLRB

Aug. 14, 2015) (Members Miscimarra & Johnson, dissenting) (stating, with regard to the General

Counsel's pleading against McDonald's, "[t]his is a serious due process problem").  Among other

things, the ALJ has approved consolidation of charges on an unprecedented, nationwide basis

guaranteeing years of collateral litigation and multiplying the burdens on all of the parties.  *See* Order

Denying McDonald's USA, LLC Motion to Sever, Ex. E to Declaration of Willis J. Goldsmith, Ex.

1.  To McDonald's knowledge, the Board has never before proposed consolidation on this scale – a

single trial involving 29 franchisees who are not alleged to have anything in common beyond a

franchise relationship with a common franchisor.[8]  Moreover, out-of-town respondents will have to

---

[7] Special appeals on various legal issues related to the administrative proceedings remain pending months after they were filed despite McDonald's requests that they be handled expeditiously.  *See* McDonald's USA, LLC's Request for Special Permission to Appeal Motion to Sever, Ex. F to Declaration of Willis J. Goldsmith, Ex. 1; McDonald's USA, LLC's Request for Special Permission to Appeal Portions of the ALJ's Case Management Order, Ex. G to Declaration of Willis J. Goldsmith, Ex. 1; McDonald's USA, LLC's Request for Special Permission to Appeal Order Granting Petitions to Revoke, Ex. H to Declaration of Willis J. Goldsmith, Ex. 1; McDonald's USA, LLC's Special Appeal from Order Denying its Motion to Amend Case Management Order, Ex. I to Declaration of Willis J. Goldsmith, Ex. 1.

[8] Additionally, although the General Counsel settles more than 90% of cases in which complaints are issued, *see* National Labor Relations Board, FY2014 Performance Accountability Report, at 64, *available at* https://www.nlrb.gov/ sites/ default/files/attachments/basic-page/node-1674/13682%20NLRB%202014%20PAR%20v5%20-%20508.pdf, here he refuses to allow the charged franchisees to settle the substantive allegations against them – by providing full relief to the employees allegedly impacted by those allegations – unless and until the franchisees also accede to the General Counsel's novel joint employment theory.  He has repeatedly demanded without budging that McDonald's and the franchisees admit the joint employer allegations in order to settle these matters.  *See* Pre-Complaint Settlement Proposal from NLRB to franchisee Faith Corporation of Indianapolis, Ex. K to Declaration of Willis J. Goldsmith, Ex. 1; Pre-Complaint Settlement Proposal from NLRB to franchisee Karavites Restaurant 5895, Inc. Ex. L to Declaration of Willis J. Goldsmith, Ex. 1.

participate in the hearings by videoconference, a solution that the General Counsel himself typically regards as inadequate even for investigatory interviews with potential witnesses. *See* Case Management Order, Ex. J to Declaration of Willis J. Goldsmith, Ex. 1. Federal courts would not permit a civil trial of this nature. *See* Fed. R. Civ. P. 21 ("Misjoinder and Nonjoinder of Parties"); *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974) (joinder of parties only appropriate where there is a "logical relationship" compelling that joinder); *Spaeth v. Michigan State Univ. College of Law*, 845 F. Supp. 2d 48 (D.D.C. 2012) (affirming severance of cases on grounds of fairness and efficiency).

Moreover, although the General Counsel investigated the SEIU's joint employment theory for more than two years, the consolidated complaint against McDonald's is entirely conclusory on that issue – the issue central to the subpoena before this Court. In this regard, the complaint alleges only: (1) there is a franchise agreement between McDonald's and each franchisee; (2) McDonald's "possessed and/or exercised control over the labor relations policies" of each franchisee; and (3) the legal conclusion that McDonald's is a joint employer. *See* Consolidated Compl. ¶¶5, 16, 25, 32, 41, 47, 55, 63, 69, 75, 86 (simply repeating these allegations as to various franchisees), Ex. D to Declaration of Willis J Goldsmith, Ex. 1. It contains no description of what McDonald's and its franchisees have done to create a joint employer relationship or under what joint employer theory the General Counsel intends to proceed. This bare-bones pleading would not pass muster in federal court. *See Ash v. Anderson Merchandisers*, No. 14-3258, 2015 WL 4978701, at *2 (8th Cir. 2015) (affirming dismissal where the complaint's "only allegation [was] simply a restatement of the legal test used to determine whether certain entities constitute a joint employer," which was "insufficient to satisfy the pleading requirements of Rule 12(b)(6)").

McDonald's moved for a bill of particulars so that it could prepare a defense to the General Counsel's unarticulated claim of joint employment. *See* McDonald's USA LLC Motions for a Bill of

Particulars, Ex. M to Declaration of Willis J. Goldsmith, Ex. 1.  The ALJ denied that request, then a divided Board affirmed 3-2.  *See McDonald's USA, LLC & Service Employees International Union, et al.*, 362 NLRB No. 168.  In dissent, Board Members Miscimarra and Johnson argued that the denial "presents an acute due process problem and is shortsighted in terms of prudently managing the Board's resources and minimizing the burdens placed on the parties."  *Id.* at *2.  In their view, the General Counsel has given McDonald's "no notice regarding the new joint employer standard upon which [he] intends to rely in the alternative, nor what facts [he] believes will prove joint employer status under the alternative standard," leading to the "all too likely" outcome that the case will be "overturned based on a denial of due process at the complaint stage" once it is reviewed in federal court.[9]  *Id.*; *cf. Indep. Elec. Contractors, Inc. v. NLRB*, 720 F.3d 543, 552-54 (5th Cir. 2013) (criticizing the General Counsel for failing to give employer adequate notice of "the matters of fact and law asserted" against it).

In any event, the hearing in the case opened on March 30, 2015, but has been adjourned twice at the General Counsel's requests and over respondents' objections.  The trial date is now January 11, 2016.

## III.  The General Counsel's Subpoenas

There is no pre-trial discovery in NLRB proceedings.  *See, e.g., Emhart Indus.,* 907 F.2d at 378 ("Pre-trial discovery, perhaps the primary source of delay in civil actions, is almost never allowed by the [B]oard").  Instead, parties are permitted to issue trial subpoenas that are returnable at the start

---

[9] Final Board decisions are subject to review in the courts of appeal and the Board has been routinely criticized by those courts.  *See, e.g., Local 777 v. NLRB*, 603 F.2d 862, 869 (D.C. Cir. 1978) (criticizing the Board for a pattern of "ad hoc and inconsistent judgments in which the only determinative elements seems to be the composition of the NLRB panel which happens to hear the case").  And while Board decisions are of course reversible due to constitutional defects, courts of appeals have reversed the Board for any number of other reasons.  For example, courts have recently reversed the Board where it departed from established precedent without a reasoned explanation, *see SDBC Holdings, Inc. v. NLRB*, 711 F.3d 281, 290 (2d Cir. 2013), and when it entrenched on Congressional objectives embodied in statutes other than the Act, *see D.R. Horton, Inc. v. NLRB*, 737 F.3d 344 (5th Cir. 2013).  Additionally, in a number of cases, courts have reversed the Board simply because the Board got it wrong.  *See, e.g., NLRB v. Atl. Veal & Lamb, Inc.,* 548 Fed.Appx. 657, 661 (2d Cir. 2013) (concluding "no rational trier of fact could reach the [Board's] conclusion") (internal quotes omitted); *NLRB v. Starbucks Corp.,* 679 F.3d 70, 78 (2d Cir. 2012) (concluding "the Board has gone too far").

of the hearing.  *See* 29 U.S.C. § 161(1) (2015) (noting that the Board "may . . . require" the

production of evidence "at any designated place of hearing"); *see also* NLRB Case Handling Manual

§§ 11778, 11782.4 (2015) (hereinafter "Case Handling Manual") (noting that subpoenas are generally

returnable on the day of the hearing).  When the General Counsel issues a subpoena relating to a

remedial issue such as joint employment, the typical practice is a rolling production that occurs as

the trial proceeds on substantive issues of liability.  *See, e.g.*, Excerpt from hearing transcript in *CSC

Holdings, LLC*, Cases No. 02-CA-085811, *et al.*, pg. 2898 (Dec. 16, 2013), Ex. 6 (transcript from

Board proceeding in which respondent produced responsive documents to the General Counsel's

subpoena on a rolling basis during the hearing and the General Counsel rested its case without

receiving the entirety of the respondent's production and privilege log).

 Here, however, the General Counsel issued a series of massive subpoenas that pertain solely

to joint employment allegations.  The General Counsel's "trial subpoena" to McDonald's consists of

118 separate demands for information, the majority of which call for documents and ESI relating to

29 separate parties (*see, e.g.*, Subpoena Request 4 (seeking business agreements with 29 different

franchisees), Requests 15-16, 39-40, 48-51, 56-60, 75-76, 82-83, and 99-109 (seeking

communications between McDonald's and 29 different franchises), and 93-98 (seeking records

unique to 29 different franchisees)).[10]  The General Counsel then asked that the trial "begin" on

March 30, 2015 (thus rendering the trial subpoena returnable), but immediately be adjourned for

months "in order to allow for the production of subpoenaed materials."  Order Adjourning Hearing

From May 26, 2015 and Establishing Procedures for the Production of Information Pursuant to

Subpoena, Ex. N to Declaration of Willis J. Goldsmith, Ex. 1.  While conceding that "in ordinary

Board hearings documents are produced pursuant to subpoena at the hearing itself," the ALJ

---

[10] As noted above, *supra* at 2, the General Counsel also served a 68-paragraph subpoena on 29 separate franchisees,
with significantly similar and overlapping requests as the one served on McDonald's.  *See, e.g.*, General Counsel
Subpoena B-1-L3BFPV to franchisee 14 East 47th Street, LLC, Ex. O to Declaration of Willis J. Goldsmith, Ex. 1.

concluded that it would be "preferable to complete the production of documents prior to beginning the presentation of witnesses."  *Id.* at 3.  Thus, while the hearing was theoretically scheduled for March 30, 2015, neither the General Counsel nor ALJ apparently intended to move forward with the hearing on that date.  Rather, the March 30, 2015 "hearing date" was merely a mechanism to allow the General Counsel a period of pre-trial discovery not contemplated by Board rules.

Despite strong objections, McDonald's has overwhelmingly complied with the subpoena.  The day after it received the subpoena, McDonald's met and conferred with the General Counsel and began producing responsive records on a rolling basis.  Thus far, McDonald's has made a 17-volume production, including over 160,000 pages of documents, incurring expenses – on litigation support vendors alone – of more than $1 million.  *See* Declaration of Jessica Allman, Ex. 2; Declaration of James R. Tuttle, Ex. 3.

Notwithstanding its substantial compliance, McDonald's maintains its objections that the subpoena is overbroad in a few particularized respects.  McDonald's has likewise stood firm on its position as to certain search and production methods, hoping to keep costs within reasonable limits and safeguard private information.  McDonald's attempts to negotiate a good-faith resolution to many of these issues failed, however, because the General Counsel resisted any meaningful modification of his subpoena.  Instead, in June 2015, the General Counsel informed the ALJ that he intended to pursue federal-court enforcement of the subpoena.  But even with a January 11, 2016 trial date looming, the General Counsel delayed his enforcement proceeding until October 1, 2015, when he at last filed an application for an order to enforce the subpoena against McDonald's.  (Dkt. Nos. 1 & 2).

<u>ARGUMENT</u>

While Section 11(1) of the National Labor Relations Act ("Act") vests the Board with the authority to issue "subpoenas requiring . . . the production of any evidence," Congress did not provide the Board with authority to enforce its own subpoenas. 29 U.S.C. § 161(1)-(2) (2015). Instead, Section 11(2) of the Act vests district courts with exclusive jurisdiction over the enforcement of NLRB subpoenas. 29 U.S.C. § 161(2) (2015). Courts have explained that "[t]his structural limitation on the NLRB's authority, emanating from the Constitution's separation of powers and due process requirements, protect[s] against abuse of subpoena power." *NLRB v. Interbake Foods*, 637 F.3d 492, 498 (4th Cir. 2011) (internal citation and quotations omitted); *see also NLRB v. Detroit Newspapers*, 185 F.3d 602, 605-06 (6th Cir. 1999) ("Despite the general policy that the NLRB should have jurisdiction in labor-management disputes, Congress specifically reserved to the federal courts the authority to provide for enforcement of subpoenas").

Oversight by the district court is essential so that entities subject to a subpoena from the NLRB "may have the full benefit of judicial review on the propriety of any demands made by the Board or its agents," and so that "those fundamental guaranties of personal rights that are recognized by the Constitution as inhering in the freedom of the citizen may be fully protected." *Precision Castings Co. v. Boland*, 13 F. Supp. 877, 883 (W.D.N.Y. 1936). Thus, in moving for enforcement, the General Counsel must demonstrate to the satisfaction of this Court "that the investigation will be conducted pursuant to a legitimate purpose," and the subpoena should not be enforced if it "is unreasonable, or issued in bad faith or for other improper purposes," or if compliance would be "unnecessarily burdensome." *NLRB v. American Medical Response, Inc.*, 438 F.3d 188, 192 (2d Cir. 2006). The statute "does not say obedience shall be ordered as of course," and the court must "exercise a reasonable discretion" as necessary "to prevent abuse … oppression, and injustice." *NLRB v. Cudahy Packing Co.*, 34 F. Supp. 53, 61 (D. Kan. 1940).

-10-

Oversight is particularly warranted given recent judicial criticism of the NLRB for its subpoenas in cases that, like this one, involve massive document requests intended to support a theory of derivative liability like joint employment.  For example, in *NLRB v. UPMC Presbyterian Shadyside*, the NLRB issued an "overly broad and unfocused" subpoena, the "massive nature" of which was beyond anything the district court had seen.  Nos. 14-mc-109, 14-mc-110, 14-mc-11, 2014 WL 4348180, at *1 (W. D. Pa. Sept. 2, 2014).  There, as here, "the unfair labor practices [were] being used, under the guise of the 'single employer' rubric, to attempt to legitimize a massive document request." *Id.* at *4.  This prompted the district court's sharp criticism that "the scope and nature of the requests," along with (as here) "the NLRB's efforts to obtain said documents for, and on behalf of, the [Service Employees International Union]," had transformed "the NLRB from its investigatory function and enforcer of federal labor law, to serving as the litigation arm of the Union, and a co-participant in the ongoing organization effort of the Union." *Id.* at *1.  That pattern has been replicated in this case.[11]

Here, the General Counsel has asked this Court for an order touching on three topics.  First, the General Counsel asks for the addition of "59 additional custodians … whose responsive documents and ESI" McDonald's has to search.  (Memo in Support, Dkt. No. 2, at 5).  Second, the General Counsel asks for McDonald's to produce unredacted documents – including "non-responsive" and "confidential-proprietary information."  (*Id.* at 25).  Finally, the General Counsel asks McDonald's to create certain reports and to obtain documents from third parties so that the Company can turn them over to the General Counsel.  For the reasons that follow, these requests

---

[11] The *UPMC* court reluctantly enforced the subpoenas because it believed a recent Third Circuit decision effectively eliminated the role of district court review of administrative subpoenas.  2014 WL 4348180, at *4 –*5.  *See EEOC v. Kronos Inc.*, 620 F.3d 287 (3d Cir. 2010); *EEOC v. Kronos Inc.*, 694 F.3d 351 (3d Cir. 2012).  *UPMC* is on appeal. The Second Circuit has not endorsed the *Kronos* rule.

are meritless.[12]

## A.      The Number of Document Custodians

This Court should deny the General Counsel's demand (Memo In Support, Dkt. No. 2, at

21-25, 36-37) that McDonald's triple the number of ESI custodians (adding 59 custodians to the 28

that McDonald's has agreed to produce).  The General Counsel's demand exceeds the bounds of

proportionality and reasonableness and far exceeds what would be permitted in civil litigation (where

parties are actually permitted by federal rules to engage in pre-trial discovery).

### 1.      Courts Rightly Deny Disproportionate and Unreasonable Requests to Expand ESI Custodian Searches

Searching the files of electronic custodians is an expensive enterprise and courts hold that

the scope of electronic data collection must be intelligently calculated to balance expense with

expected benefit.[13]  Electronic discovery "should not be permitted to continue indefinitely merely

because a discovering party can point to undiscovered documents when there is no evidence that

those documents are relevant to the case." *Sedona Principles for Elec. Document Prod. 3,* at 27 (2004).

Just because a party is "seeking access to e-mail relevant to the case" does not mean that "it [should]

be permitted to copy and inspect the active e-mail accounts of all users." *Id.  See also Zubulake v. UBS

Warburg LLC*, No. 02-cv-1243, 2003 WL 22410619, at *3 (S.D.N.Y. Oct. 22, 2003) (noting there are

various ways to manage electronic documents and thus many ways in which a party may comply

with its obligations); *cf. In re Ford Motor Co.*, 345 F.3d 1315 (11th Cir. 2003) (stating that the

---

[12] In addition to the specific reasons below, the Company has special appeals pending before the Board regarding the consolidation of the 61 separate unfair labor practice charges and the ALJ's Case Management Order, which, if decided in its favor, might render large portions of the subpoena moot.  There is no need for this Court to expend its scarce resources prematurely enforcing an irregular subpoena.

[13] Obviously, electronic discovery is far more burdensome that paper discovery because "there are vastly more electronic documents than paper documents, and electronic documents are created at much greater rates than paper documents." *Sedona Principles for Elec. Document Prod.* 3 (2004); *see also Byers v. Illinois State Police*, No. 99-cv-8105, 2002 WL 1264004, at *10 (N.D. Ill. June 3, 2002).  Moreover, "unlike most paper-based discovery, archived e-mails typically lack a coherent filing system." *Id.*  Thus, a gigabyte of information that could be stored for about $1 might easily cost $30,000 or more to review and produce.  *See id.* at 199.

-12-

producing party's choice to review database and only produce those relevant portions was adequate discovery response absent specific evidence to the contrary).  The Federal Circuit's "Model Order on E-Discovery in Patent Cases," for example, imposes a five email custodian limit per party.  *See DCG Systems, Inc. v. Checkpoint Techs, LLC*, No. 11-3792, 2011 WL 5244356, at *2 (N.D. Cal. 2011) (enforcing the five-custodian limit until such time as its restrictions "prove undue").

When applying these principles, courts routinely reject demands to expand numbers of ESI custodians to unreasonable points, where the search costs are disproportionate to the amount in controversy, particularly where there has been no showing by the requesting party that the additional searches are likely to yield relevant, unique information.  This is something illustrated in cases cited (Memo In Support, Dkt. No. 2, at 23) by the General Counsel.  *See In re Morgan Stanley Pass-Through Certificates Litig.*, No. 09-cv-2137, 2013 WL 4838796, at *2 (S.D.N.Y. Sept. 11, 2013) (refusing plaintiffs' demand that 80 custodians be searched, noting that plaintiffs had not "made a particularized showing that specific … custodians will be the exclusive custodian of relevant information" or that "the substantial work and expense of expanding the scope of custodians" was justified); *see also Bagley v. Yale Univ.*, 307 F.R.D. 59, 64 (D. Conn. 2015) (plaintiff sought and the court ultimately required production of "the ESI of *ten,* and only ten, custodians"); *Vasudevan Software Inc. v. Microstrategy Inc.*, 11–cv–6637, 2012 WL 5637611 (N.D. Cal. Nov. 15, 2012) (allowing searches of 10 custodians).

2.    The General Counsel's Request That McDonald's Triple The Number Of ESI Custodians Is Disproportionate and Unreasonably Burdensome

The Court should reject the General Counsel's demand, and it should instead limit the number of ESI custodians to the present 28.  This is so for multiple reasons.

*The Fleeting Agreement With The General Counsel.*  The present group of custodians was not unilaterally selected by McDonald's, as the General Counsel asserts in his Application.  Rather, it was selected based upon an agreement with the General Counsel.

Upon receiving the General Counsel's subpoena, McDonald's attempted to negotiate with the General Counsel to create a mutually acceptable list of custodians whose records would be searched.  At a conference on March 26, 2015, McDonald's and the General Counsel agreed upon a group of 28 custodians:  ten who worked at McDonald's headquarters (the Executive Vice President and COO, the Senior Director of Compensation and Benefits, the Senior Vice President of Human Resources, the Vice President of Human Resources, the Vice President of Training, Learning, & Development, the Senior Director of Instructional Design, Division Franchising Officers for each division, and a representative from U.S. Operations Technology), plus 18 individuals who worked in the field (i.e., with the franchisees).  This latter group included a field service consultant, a field service manager, and a human resources director from each region in which a named franchisee operates.  *See* Letter from Willis J. Goldsmith to Jamie Rucker et al. (March 29, 2015), Ex. P to Declaration of Willis J. Goldsmith, Ex. 1.

The day after the agreement was reached, however, the General Counsel withdrew from it. *See* Letter from Jamie Rucker to Doreen Davis et al. (March 27, 2015), Ex. Q to Declaration of Willis J. Goldsmith, Ex. 1.  Although the General Counsel had been "quite receptive" to the initial designation of the 28 custodians, explicitly credited McDonald's "good faith" in the process, and admitted the need to "refin[e] the scope and focus of outstanding document requests," *id.* at 1, he claimed that after "further discussions" he had concluded that the 28 custodians would "result in low quality document production."  *Id.* at 2.  The letter did not elaborate or explain why.

*The Group of 28 Is An Adequate Sample With Respect To Each Franchisee.*  The present group of 28 is a reasonable sample of the front-line McDonald's personnel (field service consultants, field service managers, and human resources directors) who interface with each charged franchisee.  As the chart below demonstrates, there are two or three custodians in different job titles for each charged franchisee (except for one which has only one custodian):

-14-

| Charged Franchisee | Custodian (with Job Title) From Whom McDonald's USA Produced ESI |
|---|---|
| AJD, Inc. | Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| Bruce C. Limited Partnership | Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| John C. Food Corp. | Anthony Cruz (Field Service Consultant) <br> Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| Lewis Foods of 42nd Street | Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| McConner Street Holding, LLC | Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| Mic-Eastchester, LLC | Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| 14 East 47th Street, LLC | Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| 1531 Fulton Street, LLC | Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| 18884 Food Corp. | Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| 840 Atlantic Avenue | Stephen Hudson (Field Service Manager) <br> Maggie Calabrese (Human Resources Director) |
| Jo-Dan MadAlisse LTD, LLC | Edit Dolce (Field Service Consultant) <br> Sue Macdade (Field Service Manager) <br> Tory Wozny (Human Resources Director) |
| K. Mark Enterprises, LLC | Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| Karavites Restaurants 11102, LLC | Anthony Redel (Field Service Consultant) <br> Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| Karavites Restaurants 26, Inc. | Anthony Redel (Field Service Consultant) <br> Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| Karavites Restaurants 5895, Inc. | Anthony Redel (Field Service Consultant) <br> Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| Karavites Restaurants 6676, LLC | Anthony Redel (Field Service Consultant) <br> Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| Lofton & Lofton Management V, Inc. | Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| Nornat, Inc. | Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| RMC Enterprises, LLC | Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |

| Charged Franchisee | Custodian (with Job Title) From Whom McDonald's USA Produced ESI |
|---|---|
| RMC Loop Enterprises, LLC | Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| Seven McD, Inc (Taylor & Malone Management)[14] | Craig Cary (Human Resources Director) |
| Mashayo, Inc. (Topaz Management, Inc.)[15] | Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| V. Oviedo, Inc. | Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| Wright Management, Inc. | Anthony Redel (Field Service Consultant) <br> Joseph Goc (Field Service Manager) <br> Craig Cary (Human Resources Director) |
| Faith Corporation of Indianapolis | Sheila Capua (Field Service Consultant) <br> Kenneth Sanders (Human Resources Director) <br> Linda Donaldson (Field Service Manager) |
| D. Bailey Management Company | Iris Rogers (Field Service Consultant) <br> Rosa Barrios (Field Service Manager) <br> Tracie Vargas (Human Resources Director) |
| Sanders-Clark & Co. | Rosa Barrios (Field Service Manager) <br> Tracie Vargas (Human Resources Director) |
| 2 Mangas, Inc. | Rosa Barrios (Field Service Manager) <br> Tracie Vargas (Human Resources Director) |
| MaZT, Inc. | Edward Radke (Field Service Consultant) <br> Diane Clinton (Field Service Manager) <br> Erick Deluna (Human Resources Director) |

Moreover, these 28 custodians are not the only ones from whom the General Counsel will receive documents. This is because he is separately seeking productions of ESI from the charged franchisees themselves. The franchisees' ESI custodians are presumably in possession of communications from McDonald's. (This may, in part, explain why the General Counsel makes no mention of those other subpoenas in his application to this Court.)[16]

*McDonald's Expenses To Date Far Exceed The Amount In Controversy.* The total potential

---

[14] In the Complaint, the General Counsel improperly named Taylor & Malone Management, the management company affiliated with the owner-operator of the restaurant at issue, Mashayo, Inc.

[15] In the Complaint, the General Counsel improperly named Topaz Management, Inc., the management company affiliated with the owner-operator of the restaurant at issue, Seven McD, Inc.

[16] Particularly in this light, there is no merit to the General Counsel's contention (at 22) that the number of custodians should be increased because McDonald's "asserts that the interactions each charged franchisee has with its Operations Consultants will be different." As to each charged franchisee, the General Counsel is already receiving a reasonable sampling of the front-line McDonald's personnel who interface with that franchisee.

financial exposure in this consolidated proceeding (the "amount in controversy") is roughly $50,000 – 20 times less than the Company has already spent on litigation support vendors to produce documents. As for the General Counsel's invocation (Memo In Support, Dkt. No. 2, at 24) of "the nature and number of the consolidated claims before the ALJ" as the asserted justification for his demand to dramatically increase the number of document custodians, the requested production here does not involve those underlying claims. It involves only the joint-employer issue, which is a question of status to be addressed only after the substantive claims are decided.

        *The General Counsel Has Not Articulated Or Demonstrated A Need For More Custodians.* As in the *Morgan Stanley* case, the General Counsel has failed to justify why the existing custodians are insufficient or why more custodians are necessary. The General Counsel is requesting an expansion of custodians that goes far beyond any comparable case of which McDonald's is aware. Yet, the General Counsel has made no particularized showing that the existing production contains anything of use to him, despite it coming from custodians in exactly the same job positions. *See* Fed. R. Civ. P. 26(b)(2)(C). Absent some demonstration that the existing custodians useful information, there is no justification for more custodians of the same types.

        The closest the General Counsel comes (Memo In Support, Dkt. No. 2, at 6) to addressing this deficiency is identifying an email "between one Operations Consultant and her assigned franchisee regarding worker staffing and positioning." But this is a far cry from evidence of a joint employer relationship between McDonald's and a franchisee under any theory.

        *McDonald's Continued Willingness To Negotiate.* McDonald's remains willing to consider the addition of a limited number of custodians so long as the General Counsel can articulate a principled reason why searches of those specific custodians' records are necessary. Indeed, McDonald's has expressed this position to the General Counsel throughout this litigation. Transcript of June 2, 2015 Hearing at 178:9-14, 179:24-180:1, Ex. R to Declaration of Willis J. Goldsmith, Ex. 1; Transcript of

June 23, 2015 hearing at 306:8-13, Ex. S to Declaration of Willis J. Goldsmith, Ex. 1.  But it is not acceptable to triple the custodians without any particular rationale 11 weeks before trial, especially given the extensive amount of time and money it would take and when production from the original 28 is still not complete.[17]

## B.    Documents That McDonald's Does Not Possess

McDonald's repeatedly has informed the General Counsel that it has no documents responsive to certain requests.  In some cases, the General Counsel has argued that  McDonald's should either create responsive records or get the records from someone who has them.  There is no merit to either position.

### 1.    The General Counsel's Demand for McDonald's To Create ISP Reports

A number of the General Counsel's requests[18] ask McDonald's to produce "reports" generated by charged franchisees' In-Store Processor ("ISP") computer systems.  In his papers (Memo In Support, Dkt. No. 2, at 34) the General Counsel asks this Court to order McDonald's to "produce" certain ISP reports[19] by creating those reports using franchisee ISP data and delivering

---

[17] While McDonald's is willing to negotiate, the General Counsel's "sampling proposal" (at 23-25, 37) is unacceptable.  First, the proposal is not a reduction in the number of custodians at issue.  Under the General Counsel's terms, McDonald's would produce ESI from an additional 20 custodians, and then "the [ALJ would] determine whether McDonald's should produce responsive documents" from all other proposed custodians.  (Id. at 37.)  In other words, the General Counsel's only offer is to delay subpoena enforcement proceedings.  Second, even if 20 additional custodians was a firm number, that number would be disproportionately and unreasonably high for the reasons stated above.  Third, the General Counsel improperly wants to abdicate his burden of proving that the additional searches he seeks will produce a meaningful quantity of relevant, non-duplicative documents that outweighs the extensive burdens and costs that doing so will impose on McDonald's.  (Id. at 25 (stating that he is only willing to forego additional searches "should McDonald's be able to demonstrate" that "the burden or expense of adding these additional custodians outweigh[s] the actual benefit").  As noted above, the General Counsel has not demonstrated that it has been worth the candle to search 28 custodians, the current sample size, and he offers no reason to suspect that enlarging the sample will change matters.

[18] See, e.g., Subpoena Request No. 69 ("All labor scheduling recommendations made by a Charged Franchise's copy of the In-Store Processor . . ."); Subpoena Request No. 72 ("All reports evaluating employee staffing or scheduling by a Charged Franchise on any other basis . . ."); Subpoena Request No. 73 ("All shift or position assignment recommendations made by a Charged Franchise's copy of the In-Store Processor . . .").

[19] The reports that the General Counsel asks (at 34) McDonald's to produce are Daily Activity Reports, LAB Reports, Projected LAB Reports, Fixed Labor Analysis Reports, Crew Staffing Budget Analysis Reports, and Manager Schedule Violation Reports.

them to the General Counsel.  For multiple reasons, the General Counsel's positions are baseless.

*McDonald's Does Not Possess Franchisees' ISP Reports.*  As McDonald's has attempted to explain to the General Counsel, it cannot produce the requested ISP reports because it does not possess them.  *See* Declaration of Michael Lewis at ¶¶4-6, Ex. 4.  As background, an ISP is a computer most franchisees use to run back-office functions: tracking sales, inventory management, and, in many cases, certain functions related to employee timekeeping.  *See id.*  Franchisees are capable of running a number of reports from their ISPs locally.  *Id.*  However, McDonald's has never sought possession of, or maintained custody over, the reports that franchisees create locally using their ISPs.  *See id.*  McDonald's also does not create ISP reports for franchisees or using franchisees' data.  *See id.*  Thus, McDonald's has no documents responsive to the requests at issue.

*McDonald's Has No Ability To Produce The Requested ISP Reports.*  Further, McDonald's cannot create the requested ISP reports because it does not possess the franchisees' data needed to do so.  *See* Declaration of Michael Lewis at ¶6, Ex. 4.  McDonald's does access and use some franchisee ISP data to, for example, assess large-scale sales trends.  *See id.*  However, McDonald's does not access or possess the data that underlies the reports at issue.  *See id.*  Thus, even there was a potential legal obligation to create documents for production – although, as will be addressed below, there is no such obligation – it could not attach here because the Company has no ability to create the reports that the General Counsel seeks.

*McDonald's Has No Obligation To Create Documents.*  In all events, McDonald's has no obligation to create documents for the sole purpose of producing them to the General Counsel.  Even in federal court litigation (where discovery is allowed), it is black letter law that a party "is not required to prepare, or cause to be prepared, new documents solely for their production." *Alexander v. FBI*, 194 F.R.D. 305, 310 (D.D.C. 2000); *see also* 8A Wright, Miller & Marcus, Federal Practice and Procedure § 2210 (2d ed. 1994) (a party "cannot be required to permit inspection of documents or

things that it does not have").  In federal civil litigation, that limit is imposed by Rule 34:  "Rule 34 cannot be used to require the adverse party to prepare, or cause to be prepared, a writing to be produced for inspection, but can be used only to require the production of things in existence." *Soetaert v. Kansas City Coca Cola Bottling Co.*, 16 F.R.D. 1, 2 (W. D. Mo. 1954) (citations omitted).  The General Counsel's power to request "evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question," 29 U.S.C. §161(1), imposes the same implicit limitation:  the evidence must already exist (or else it cannot yet "relate[]" to anything).

        2.      <u>The General Counsel's Demand For McDonald's To Create R2D2 Reports</u>

Several of the General Counsel's requests seek documents known as R2D2 reports.[20] Specifically, he asks the Court (Memo In Support, Dkt. No. 2, at 34) to order McDonald's to produce (*i.e.*, create and deliver) two types of R2D2 reports: All Hours VLH vs. Schedule Reports and All Hours Actual Review Reports.  Again, the General Counsel misses the mark.

McDonald's offers franchisees a subscription service called R2D2 under which McDonald's will generate certain reports for a franchisee using the franchisee's own data.  *See* Declaration of Michael Lewis at ¶7-9 , Ex. 4.  There are approximately fifty R2D2 reports a franchisee can order, but McDonald's only generates those that the franchisee orders and pays for.  *Id.*  McDonald's does not store or retain franchisee reports.  *See id.*  However, if it chooses, a franchisee may share its own R2D2 reports with someone from McDonald's, such as the field service employees assigned to its stores, in order to facilitate discussion regarding some aspect of the franchisee's business.  *See id.* When that happens, the field service employee(s) may have certain franchisee R2D2 reports in retained email or other electronic files.  *See id.*  The only way to locate these reports, however, is

---

[20] *See, e.g.,* Subpoena Request No. 70 ("All reports evaluating employee scheduling by a Charged Franchise against sales projections, including the All Hours VLH Guide Vs Schedule . . ."); Subpoena Request No. 71 ("All reports evaluating employee scheduling by a Charged Franchise against actual sales, including the All Hours Actual Review . . ."). Notably, despite clear direction in the NLRB's Casehandling Manual that "[t]he use of the word 'all' in the description of records should be avoided wherever possible" in Board subpoenas, 73 of the 118 requests in the Subpoena violate this directive.

through a burdensome person-by-person search.  *See id.*

McDonald's has informed the General Counsel that it does not possess franchisee R2D2 reports aside from what may be retained in certain custodians' ESI, and McDonald's has agreed to produce any R2D2 reports uncovered through custodial ESI searches.  *See* Transcript of June 23, 2015 Hearing at 304:15-20, Ex. S to Declaration of Willis J. Goldsmith, Ex. 1.  To date, McDonald's has produced over 3,500 of these reports which were found in the ESI of the original 28 custodians. *See* Declaration of Willis J. Goldsmith at ¶4.

Against this backdrop, the General Counsel's request that McDonald's create tens of thousands of All Hours VLH vs. Schedule Reports and All Hours Actual Review Reports, let alone any other franchisee R2D2 reports, must be rejected.  <u>First</u>, McDonald's "is not required to prepare, or cause to be prepared, new documents solely for their production," *Alexander*, 194 F.R.D. at 310, so the General Counsel's request fails as a matter of law.

<u>Second</u>, even if McDonald's had such a legal obligation, which it does not, the General Counsel's request still must be rejected as unreasonable  and overly burdensome.  McDonald's has no ability to create historical R2D2 reports on an automated basis.  *See* Declaration of Michael Lewis at ¶9, Ex. 4.  While the Company might be able to manually create one or a few historical R2D2 reports – assuming that it still possesses the necessary underlying data and the software script used to create the reports in the first place – it has no software or other method for generating the volume of historical R2D2 reports requested by the General Counsel.  *See id.*  Absent some explanation of how tens of thousands of R2D2 reports likely will contain unique and non-redundant information, the General Counsel cannot justify the time, burden, and expense McDonald's would face – if McDonald's could do this at all.

<u>Third</u>, the General Counsel's cases – which address the "changing law regarding database production" – are inapposite and do not support the General Counsel's position.  Those cases

involve assessments of whether a responding party should be made to extract particular data elements in the circumstances presented.  See, e.g., *In re eBay Seller Antitrust Litigation*, No. 07-1882, 2009 WL 3613511, at *3 (N.D. Cal. Oct. 28, 2009) (responding party required to extract requested data, despite costs, since "hundreds of millions of dollars" were at issue); *Powerhouse Marks, LLC v. Chi Hsin Impex, Inc.*, 04-cv-73923, 2006 WL 83477, at *3 (E.D.  Mich. Jan. 12, 2006) (responding party to produce "annual sales figures and expenditures for specific products"); *NLRB v. Champagne Drywall, Inc.*, 502 F. Supp.2d 179, 181 (D. Mass. 2007) (similar);  *Jinks-Ustead v. England*, 227 F.R.D. 143, 155 (D.D.C. 2005) (similar).  But the General Counsel has not asked McDonald's to produce a database or specified data elements.  Instead, he has asked McDonald's to recreate tens of thousands of reports one-by-one manually (or try to create software to do it automatically) – in a matter in which roughly $50,000 is at stake – and in none of his cases were respondents compelled to do such a tremendous task.[21]

### 3.   Aon/Franke Records

With respect to subpoena paragraphs 17, 19, 21, 22 and 45, McDonald's has fully responded – it has produced the few responsive documents in its possession, custody, and control, and it has informed the General Counsel that it has nothing else responsive.  The General Counsel, however, seeks an order that would compel McDonald's to somehow obtain and produce records pertaining to franchisees that may be in possession of third-party custodians, Aon and Franke Resupply Systems, Inc., or the franchisees themselves.

---

[21] Also misplaced is the General Counsel's invocation (at 35-36) of McDonald's revenues as an attempted counter to the clear burden of his requests.  Disproportionate and unreasonable discovery is not suddenly permitted if the party upon which it is inflicted has the means to pay for it.  For example, in *EEOC v. Morgan Stanley & Co.*, 132 F. Supp. 2d 146, 161-62 (S.D.N.Y. 2000) – which the General Counsel cites (at 36) – the reviewing court quashed a demand that "a company the size of Morgan Stanley, with over 93,000 employees in 500 offices," compile and produce information on "informal complaints," since "[t]he burden" of gathering the requested information "far outweighs the value that a record of such 'informal' griping might have for the [agency's] investigation."  That mode of analysis – comparing the efforts and costs of the requested production to its demonstrated need or usefulness to the case at hand – is what should be applied in considering whether the requests at issue are impermissibly burdensome.  Moreover, and as the foregoing demonstrates in any event, burden is only one of many grounds on which a subpoena enforcement application can and should be denied.

Aon operates a web-based hiring platform called "Hiring to Win", which some franchisees use at their restaurants (because they want to, not because they are required to do so by McDonald's).  Franke sells certain forms, applications, and other papers to franchisees if the franchisees want to purchase them (again, not because McDonald's makes them purchase them). The General Counsel would have McDonald's obtain from Aon and Franke documents pertaining to the charged franchises and then furnish those document to the General Counsel.  (Memo In Support, Dkt. No. 2, at 29-31, 38.)  The General Counsel's request must be denied.

As an initial matter, it is "fairly obvious that a [responding] party … need not seek . . . documents from third parties if compulsory process against the third parties is available to the party seeking the documents."  *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007). That straightforward principle should decide this issue:  there is no reason the General Counsel cannot use compulsory process to get what he wants from Aon and Franke directly, or from the charged franchisees, so it is "fairly obvious" that McDonald's "need not seek such documents" from those custodians.  *See also Alexander Interactive, Inc. v. Adorama, Inc.*, 12-cv-6608, 2014 WL 61472, at *4 (S.D.N.Y. Jan. 6, 2014) (it is "settled law that a responding party need not seek such documents from third parties if compulsory process against the third parties is available to the party seeking the documents").

Yet, even if the General Counsel could not pursue the documents at issue directly from Aon, Franke, or the charged franchisees, McDonald's still would not be required to seek them on his behalf because they are not within McDonald's "possession, custody, or control."  Fed. R. Civ. P. 34(a)(1).  There is no dispute that McDonald's lacks "possession" or "custody" of the documents at issue.  And, as the General Counsel notes, a responding party is only deemed to have the required "control" over documents if it has "the practical ability to obtain the documents."  *In re Flag Telecom Holdings, Ltd.*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006).  He ignores, though, that whether such

-23-

"control" exists requires evaluating factors such as the existence of cooperative agreements between the responding party and non-party, the extent to which the non-party has a stake in the outcome of the litigation, and the non-party's past history of cooperating with document requests. *See, e.g., In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007), *aff'd sub nom. Gordon Partners v. Blumenthal*, No. 02-cv-7377, 2007 WL 1518632 (S.D.N.Y. May 17, 2007); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992). The General Counsel has not even alleged, let alone provided evidence, on any of these points. Based on its own reasonable investigation, McDonald's has not uncovered any agreements or historical requests for such documents from Aon or Franke, either.

In the case of a dispute over control, it is the requesting party – here, the General Counsel – that bears the burden of establishing it. *See In re Flag Telec. Holdings, Ltd.*, 236 F.R.D. at 180; *Wiwa v. Royal Dutch Petroleum Co.*, No. 96-cv-8386, 2009 WL 529224, at *2 (S.D.N.Y. Feb. 17, 2009). Yet, the General Counsel has not even asserted that Aon's or Franke's documents are under McDonald's "control" in the relevant sense, let alone come forward with evidence that might begin to satisfy his evidentiary burden. Rather, with regard to Aon, the most the General Counsel offers (Memo In Support, Dkt. No. 2, at 14) is that McDonald's explains to franchisees how to purchase Hiring to Win (*i.e.*, by ordering it from Aon) and how they can use it, and that McDonald's has attached its Golden Arches logo to the Hiring to Win website. Certainly, explaining how to purchase or use an internet or software program (*e.g.*, Google.com or Microsoft Excel) or licensing a trademark for use on a website do not relate to whether, much less establish that, McDonald's has control over documents that Aon may have generated for franchisees. With regard to Franke, the General Counsel actually confirms McDonald's lack of control over the documents he seeks (*id.* at 15), explaining that McDonald's instructs its franchisees that the documents must be obtained from Franke. The General Counsel's application to require McDonald's to attempt records of third-party custodians should therefore be denied.

### C.     Redaction of Documents

McDonald's has engaged in limited redactions with respect to some of the documents that it has produced – approximately 12% of the documents produced thus far contain at least one redaction.  *See* McDonald's USA, LLC's Statement Regarding Redaction of Certain Documents Produced in Response to Subpoena, Ex. 5.  Those redactions, which fall into two categories, are permissible.

### 1.     Information That is Not Responsive

Federal courts permit the redaction of information that is non-responsive to a subpoena. Where a party does not "establish that the redacted portions of [a] document" are "responsive to their discovery requests," production is not required.  *Kingsway Fin. Servs., Inc. v. Pricewaterhouse Coopers LLP*, No. 03-cv-5560, 2007 WL 473726, at *3 (S.D.N.Y. Feb. 14, 2007).  *See also Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, Nos. 93-cv-5298, et al, 1997 WL 563792, at *1 (S.D.N.Y. Sept. 10, 1997) (same).[22]  This practice mirrors the government's custom of redacting non-responsive information from material produced in response to FOIA requests.  *See, e.g., Conti v. U.S. Dep't of Homeland Sec.*, No. 12-cv-5827, 2014 WL 1274517, at *27 (S.D.N.Y. Mar. 24, 2014).

Pursuant to that standard, McDonald's has redacted three categories of information that are non-responsive to the subpoena.  First, the subpoenas are temporally limited:  nearly all of the requests are limited to the three-year period January 1, 2012 to December 31, 2014.  *See* Subpoena, Instruction No. 27.  Where a responsive document contains some information from outside the

---

[22] The General Counsel's reliance on cases such as *Orion Power Midwest, L.P.*, No. 05-cv-555, 2008 WL 4462301 (W.D. Pa. Sept. 30, 2008), is misplaced.  First, *Orion Power* relies on the text of Rule 34 (which is not directly applicable in Board practice because, once again, discovery is not utilized).  Second, *Orion Power* – as with other cases cited by the General Counsel, like *McNabb v. City of Overland Park*, No. 12-cv-2331, 2014 WL 1152958 (D. Kan. Mar. 21, 2014) – arise outside of this district and McDonald's respectfully suggests that they are wrongly decided.  The only case from this district cited by the General Counsel is *Anthropologie, Inc. v. Forever 21, Inc.*, No. 07-cv-7873, 2009 WL 690126 (S.D.N.Y. Mar. 13, 2009), which neither comes to grips with the weight of authority in this district to the contrary nor explains its reasoning.  As to the crucial question, *Anthropologie* says – in its entirety – "[t]he short answer to this issue is that defendants are required to produce the non-privileged documents in unredacted form."  *Id.* at *5.  No "long answer" is provided.

pertinent time frame, McDonald's has redacted the temporally non-responsive information and produced the information from within the relevant time frame.  Similarly, most of the subpoena requests seek information regarding a charged franchisee.  *See* Subpoena Requests No. 7, 38, 40, 77, 95, 108.  McDonald's has accordingly redacted information pertaining to uncharged franchisees. Likewise, many of the subpoena requests go to specific restaurants owned by charged franchisees. *See* Subpoena Instruction No. 3, Requests No. 93.  McDonald's has therefore redacted non-responsive information related to the restaurants that are not at issue.

The General Counsel objects to these redactions (Memo In Support, Dkt. No. 2, at 25–29), but never explains why they are objectionable.  He suggests (*id.* at 27) that the documents will lack "context," but he does not point to a single instance of a document that is deprived of some supposed relevant context by these routine redactions.[23]  Nor can there be any credible claim of delay:  McDonald's has produced, in extraordinarily short order, over 160,000 pages of documents, almost certainly more quickly than the General Counsel can possibly have reviewed them, and has sought (unsuccessfully) to receive an assurance from the General Counsel that he actually intends to proceed with the scheduled January 11, 2016 trial date.[24]  *See* McDonald's USA, LLC's Motion to Preclude Any Further Continuances, Ex. T to Declaration of Willis J. Goldsmith, Ex. 1.  It is the General Counsel who set up a "sham" hearing date on March 30, 2015 so that he could engage in a pre-trial discovery period, then sought (over McDonald's objections) two additional continuances, then opposed McDonald's motion to prohibit further continuances.  *See id.*  If there is delay in this litigation, it is entirely attributable to the General Counsel.  Any delay is not attributable to

---

[23] The General Counsel also purports to worry (at 29) that McDonald's may incur "undue expense" in redacting documents.  Were he legitimately concerned with the expenses associated with responding to his subpoena, the better approach would have been for him to have more reasonably limited his subpoena in the first instance.

[24] The General Counsel opposed McDonald's USA's Motion to Preclude Future Continuances, which the ALJ denied, strongly suggesting that he will seek yet another continuance.  *See* ALJ Order Denying McDonald's USA, LLC's Motion to Preclude Any Further Continuances, Ex. U to Declaration of Willis J. Goldsmith, Ex. 1.

McDonald's and surely not to its redactions of non-responsive information.

2.   <u>Information That Is Sensitive And Irrelevant</u>

Federal courts also permit the redaction of sensitive information, even if it is arguably responsive, where such information has no relevance to the matters at issue. *See*, *e.g.*, *Sentry Ins. A Mut. Co. v. Brand Mgmt. Inc.,* No. 10-cv-347, 2012 WL 6617357, at *2 (E.D.N.Y. Dec. 19, 2012) (noting previous order denying motion to compel unredacted federal tax returns); *New Amsterdam Capital Partners, LLC v. Wilson,* No. 11-cv-9716, 2013 WL 1874586, at *1 (S.D.N.Y. May 1, 2013) (denying defendant's request for unredacted investor information where he failed to demonstrate why investor identity was relevant to his defense); *see also Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 813 (7th Cir. 1994) (affirming denial of motion to compel unredacted tax return information revealing amounts earned unrelated to the cause of action); *Abbott v. Lockheed Martin Corp.,* No. 06-cv-701, 2009 WL 511866, at *3 (S.D. Ill. Feb. 27, 2009) (permitting "redaction of information regarding . . . defined benefits plans . . . because that information [was] not relevant to the issues in th[e] case").

Pursuant to that standard, McDonald's redacted social security numbers from responsive documents. That should be noncontroversial – social security numbers are not pertinent to any conceivable issue – and it is arguably required under the Board's own practices. *See*, *e.g.*, Case Handling Manual § 10052.11 ("If a document containing a social security number must be released to the public, the Regional Office should redact the number from the document.").

McDonald's also redacted addresses and telephone numbers appearing in organizational charts that detail McDonald's management structure, including positions such as Division President and Senior Vice President. There likewise should be no controversy over these redactions. Since McDonald's is represented by counsel, the General Counsel is subject to legal and ethical restrictions on contacting such individuals without permission of counsel. *See*, *e.g.*, Case Handling Manual, Part

I, § 10058 (generally providing that where "a party is represented by an attorney, a Board agent must contact and obtain consent from the party's attorney before initiating contact with or interviewing a current supervisor or agent"). The General Counsel therefore has no legitimate need for contact information, and has no legitimate basis for challenging McDonald's redaction of address and phone information.

Finally, in some cases, McDonald's redacted franchisee financial information from documents that it produced. The franchise agreements McDonald's produced, for example, contain information related to the calculation of the franchisee's rent payments. Additionally, certain documents that McDonald's produced contain information related to a franchisee's cash position. Even if this information is within the subpoenas' temporal scope and related to a franchisee and restaurant at issue in the Complaint, it is both highly sensitive and completely irrelevant to the issues in this case. Even in his "quite broad" list of the "range of employment relationship features potentially relevant to a joint employment determination," *see* Opposition to Respondent McDonald's USA, LLC's Petition to Revoke Subpoena Duces Tecum B-1-L39K3Z, at 4-5, Ex. V to Declaration of Willis J. Goldsmith, Ex. 1, the General Counsel did not invoke a franchisee's rent or its cash position as factors that would be relevant and as a matter of law they are not. Even under the Board's recently-expanded and much-criticized test for joint employer status in the contractor context, "*only* an entity's control over terms of employment, not the wider universe of all underlying economic facts" is relevant. *BFI Newby Island Recyclery*, 362 NLRB No. 186, at *21 (emphasis added).

The General Counsel repeatedly invokes the protective order, but that order is not dispositive of the redaction issue. First, for much of the redacted information, the issue is not confidentiality, but responsiveness. The General Counsel has not asked for this information, and so there is no reason for him to have it – protective order or not. Moreover, as to highly sensitive information, redactions and a protective order frequently are used in tandem. The government

knows this perfectly well, since such procedures are frequently used at its insistence. *See*, *e.g.*, *United States v. Gangi*, No. 97-cr-1215, 1998 WL 226196 (S.D.N.Y.  May 4, 1998).  A great deal of information that is sensitive but not (for example) as sensitive as a Social Security number is being disclosed to the General Counsel, and McDonald's is within its rights to insist that the information still remain under a protective order.  As *Gangi* put it, a protective order on top of redactions can "protect the privacy [and other] interests" of (for example) individuals identified but whose identifying information will not be redacted.  *Id.* at *1.

In sum, McDonald's has produced the vast majority of its documents wholly unredacted.  As to the small category of documents that has been redacted, all that is being withheld is information that is either nonresponsive, irrelevant and highly sensitive, or all of the above.  The General Counsel's demand that McDonald's undo these redactions should be rejected.

## CONCLUSION

For the foregoing reasons, the General Counsel's request for an Order enforcing its Application to enforce its Subpoena Duces Tecum B-1-L39K3Z should be denied.

Dated:  October 26, 2015                    Respectfully submitted,


                                            s/ Willis Goldsmith
                                            Willis J. Goldsmith
                                            Doreen S. Davis (*pro hac vice* pending)
                                            Ian Samuel
                                            Joshua Grossman
                                            JONES DAY
                                            222 East 41st Street
                                            New York, New York 10017
                                            Tel: 212.326.3939
                                            Fax: 212.755.7306
                                            wgoldsmith@jonesday.com
                                            ddavis@jonesday.com
                                            isamuel@jonesday.com
                                            jgrossman@jonesday.com

                                            Jonathan M. Linas (*pro hac vice* pending)
                                            JONES DAY
                                            77 West Wacker Drive
                                            Chicago, Illinois 60601
                                            Tel: 312.269.4245
                                            Fax: 312.782.8585
                                            jlinas@jonesday.com

                                            *Attorneys for McDonald's USA, LLC*