Rachel V. See, Esq.
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570
(202) 273-3848

*Counsel for the Applicant*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------

**NATIONAL LABOR RELATIONS BOARD,**

        Applicant,

   v.                                     USDJ Colleen McMahon
                                          15–MC-322–P1

**MCDONALD'S USA, LLC,**

        Respondent.

----------------------------------------------------------------------

**<u>DECLARATION OF JAMES C. RUCKER IN SUPPORT OF REPLY IN SUPPORT OF
THE NATIONAL LABOR RELATIONS BOARD'S APPLICATION FOR AN ORDER
REQUIRING OBEDIENCE TO ADMINISTRATIVE SUBPOENA *DUCES TECUM* B-1-
L39K3Z</u>**

I, James C. Rucker, have personal knowledge of the following facts and, if called to testify, would do so as follows:

1.       I am a Field Attorney for the National Labor Relations Board ("Board"), Region 2, in New York, New York. I am also Counsel for the General Counsel in 75 Board cases that have been consolidated for hearing before Administrative Law Judge Lauren Esposito regarding unfair labor practice allegations against McDonald's USA, LLC ("McDonald's"), Respondent in this matter, and 30 franchised McDonald's restaurants. I am also Counsel for the National Labor Relations Board (the Applicant) in this matter.

1

2.      The Exhibits attached hereto are true and accurate copies of (1) a communication received in the course of investigating and litigating the Board cases consolidated before ALJ Esposito, maintained in the Board's official case files in accordance with standard Board policy and practice, and (2)–(4) documents produced by McDonald's in response to Subpoena *Duces Tecum* B-1-L39K3Z.

I declare under penalty of perjury under the Laws of the United States of America that the foregoing is true and correct.

DATED AT New York, New York, this 29th day of October, 2015.

/s/ James C. Rucker
James C. Rucker
Counsel for Applicant

Exhibit 1

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017-6702

TELEPHONE +1 212 326 3939 • FACSIMILE +1 212.755 7306

DIRECT NUMBER (212) 326-3649
WGOLDSMITH@JONESDAY.COM

JP540661:jml                              October 3, 2013
611358-600119


VIA FEDERAL EXPRESS & EMAIL

Mr. Barry J. Kearney
Associate General Counsel of the Division of Advice
National Labor Relations Board
1099 14th St. N.W.
Washington, D.C. 20570-0001
barry.kearney@nlrb.gov

> Re:    Fast Food Workers Committee (McDonald's USA, LLC), Cases No. 2-CA-
> 093893, 2-CA-093895, 2-CA-093927, 2-CA-094224, 2-CA-094679, 2-CA-
> 097827, 2-CA- 097305, 2-CA-98604, 2-CA-098009, 2-CA- 098662, 2-CA-
> 098659, 2-CA-098676, 2-CA-103384, 2-CA-103390, 2-CA-103430, 2-CA-
> 103726, 2-CA-103771, 2-CA-105591, 2-CA-106094

Dear Mr. Kearney:

This letter follows up on our discussion with respect to McDonald's USA, LLC
("McDonald's" or "Company") as an alleged joint employer in the above-referenced unfair labor
practice charges ("Charges") filed by the Fast Food Workers Committee. We appreciate the
opportunity to supplement the position statements McDonald's submitted to the Region in these
cases and that are currently before the Division of Advice ("Division" or "Advice").[1]

Notwithstanding the Company's lack of involvement with the substantive allegations of
the Charges, we understand that Advice currently is evaluating whether McDonald's could be
found liable as a joint employer with the franchisees named in the Charges. I am writing to
underscore that there is no factual or legal basis for such a finding. Under the standard used by
the Board for nearly three decades to evaluate joint employer relationships, McDonald's falls far
short of exerting the type of significant "direct and immediate" control that would render it liable
for the actions of its franchisees here. Indeed, McDonald's exhibits none of the "indicia of
control" over these franchisees that the Board and courts regularly have found reflect joint
employer status. The standard franchising tools used by McDonald's to ensure the uniformity of
operations necessary to protect its brand, trade name, and trademarks, are not sufficient evidence

---

[1] McDonald's previously submitted position statements to Region 2 on January 11, 2013, March 26, 2013, May 29,
2013, July 5, 2013, and July 25, 2013.

October 3, 2013
Page 2

of control by McDonald's over its franchisees, much less evidence of the extensive exercise of control necessary to establish a joint employer relationship. Accordingly, we urge Advice to recommend that the Region decline to go to complaint against McDonald's on the joint employer question. Doing so would be entirely consistent with both longstanding Board law and, importantly, the understanding of the legal landscape a major component of our economy has relied upon for years.

A joint employer finding as to McDonald's on these charges would have extremely far reaching and negative implications. Approximately 90% of the over 14,000 McDonald's restaurants in the United States are owned and operated by franchisees. The direct effects of such a finding – namely, that McDonald's would face potential liability under the National Labor Relations Act ("Act") in the present cases and be subject to bargaining obligations in the event its franchisees' employees unionize – perhaps pale in comparison to the indirect effects of such a finding. For instance, McDonald's will be forced to either face continuing liability for the actions of its franchisees or limit guidance to its franchisees and thereby risk damage to its valuable, worldwide brand – a brand it has carefully cultivated and protected for over half a century. Moreover, a joint employer finding here would not only serve as precedent that would impact McDonald's future liability under the Act, but also potentially its liability for its franchisees' conduct at common law and under multiple statutory schemes. Facing the possibility of such severe, negative outcomes, and in the absence of informal resolution – which is unlikely here for many reasons – the General Counsel and Board will have left McDonald's no real choice but litigation notwithstanding its costs, likely duration, and attendant uncertainties for all involved.

The ripple effects of a joint employer decision would extend well beyond McDonald's. It would impact the hundreds of thousands of franchise businesses that operate in various sectors of the economy. If McDonald's is alleged to be liable for the actions of its franchisees based on the facts before the Board here, franchisors everywhere will consider themselves at risk. They will face identical legal exposure and increased limitations on their ability to operate successful franchises. This will undoubtedly prevent some number of new franchising arrangements from getting off the ground and cause many existing franchisors to modify or eliminate their franchising strategies going forward. Given the Board's stated policy of interpreting the Act to encourage the free flow of commerce, the negative impact of such a decision on the considerable portion of the U.S. economy involved in franchise businesses cannot be ignored.

I.   MCDONALD'S IS NOT A JOINT EMPLOYER UNDER WELL-SETTLED BOARD LAW.

A.   Overview of Board Law.

"Prior to 1982 when the United States Court of Appeals for the Third Circuit decided *NLRB v. Browning-Ferris Industries*, 691 F.2d 1117 (3rd Cir. 1982), the Board's analysis of

JONES DAY

October 3, 2013
Page 3

what constituted a joint employer relationship was somewhat more amorphous" than it has been for the past thirty years. *The Goodyear Tire & Rubber Co.*, 312 NLRB 674, 676 (1993). Before that decision, the Board had found joint employer status in cases where one entity exerted only "indirect control" over the discipline and wages of another entity's employees; where the ability of one entity to control the terms and conditions of employment for another entity's employees was permitted by contract, even if not actually exercised; and where "industrial realities" made one entity a "necessary party to meaningful collective bargaining," even though it played no role in hiring, firing, or directing the other entity's employees. *In re Airborne Freight*, 338 NLRB 597, 598 (Member Liebman, concurring) (discussing cases). *See Floyd Epperson*, 202 NLRB 23 (1973), enf'd 491 F.2d 1390 (6th Cir. 1974); *Jewel Tea Co.*, 162 NLRB 508 (1966); *Jewell Smokeless Coal*, 170 NLRB 392 (1968), enf'd 435 F.2d 1280 (4th Cir. 1970).

Since *Browning-Ferris*, however, the Board has employed a much narrower standard for evaluating whether two otherwise independent legal entities are joint employers under the Act. *TLI, Inc.*, 271 NLRB 798 (1984), enf'd 772 F.2d 894 (3d. Cir. 1985) (adopting *Browning-Ferris* standard). *See also In re Airborne Freight*, 338 NLRB at 597 (Member Liebman, concurring) (referring to the "current, narrow standard" used by the Board).[2] The well-settled test is whether entities "share or codetermine those matters governing the essential terms and conditions of employment" with regard to the employees at issue. *Id.* The "essential terms and conditions of employment" are those involving such matters as hiring, firing, discipline, supervision, and direction of employment. *Laerco Transportation*, 269 NLRB 324 (1984).

In assessing the existence of a joint employer relationship, the Board and courts focus on the "indicia of control" that one entity exerts over the employees of another during the period surrounding alleged unfair labor practice(s). *Clinton's Ditch Cooperative*, 778 F.2d 132, 138 (2d Cir. 1985); *Yoon Maintenance Co.*, 292 NLRB 1159 (1989); *Laerco Transportation*, 269 NLRB 324 (1984). In *Clinton's Ditch Cooperative*, the Second Circuit Court of Appeals spelled out five indicia of control to be considered when evaluating joint employer status: (1) did one entity hire or fire another entity's employees; (2) did it directly administer disciplinary procedures for those employees; (3) did it maintain records of hours, handle the payroll, or provide insurance for those employees; (4) did it directly supervise those employees; and (5) did it participate in the collective bargaining process. *Clinton's Ditch Cooperative*, 778 F.2d at 138. *See also AT&T v. NLRB*, 67 F.3d 446, 451 (2d Cir. 1995) (re-affirming factors to consider).

Indirect control of another entity's employees is plainly insufficient to establish joint employer status; rather, the control must be "direct and immediate". *Airborne Express*, 338

---

[2] In *M.B. Sturgis, Inc.*, 331 NLRB 1298 (2000), the Board declined to reexamine or expand the existing Board standard for evaluating the joint employer relationship. Similarly, despite Member Liebman's urging in *Airborne Express*, 338 NLRB 597 (2002), the Board has held fast to its longstanding formulation of the joint employer test.

JONES DAY

October 3, 2013
Page 4

NLRB at 605. *See also Flagstaff Med. Ctr., Inc.*, 357 NLRB No. 65, 2011 WL 4498271, at *11 (Aug. 26, 2011) (putative joint employer must "meaningfully affec[t]" matters such as the hiring, firing, discipline, supervision and direction of another entity's employees). Moreover, the proper focus is on the actual control exerted by one entity over another's employees rather than the potential right of control. *AM Property Holding Corp.*, 350 NLRB 998, 1000 (2007) ("In assessing whether a joint employer relationship exists, the Board does not rely merely on the existence of . . . contractual provisions, but rather looks to the actual practice of the parties."); *TLI, Inc.*, 271 NLRB at 798-799 (employer's actual role in supervising and directing employees insufficient to establish joint employer relationship despite provision in lease agreement that employer would maintain "operational control, direction, and supervision" of employees).

Under this standard, the Board has refused to find a joint employer relationship even when one entity engaged in "pervasive domination of the [other entity's] operations," owned the facilities and equipment used by the other entity, had onsite management at the other entity's facility, and negotiated with the other entity over the wage rates of the employees at issue. *In re Airborne Express*, 338 NLRB 597 (2002). Similarly, the Second Circuit refused to find joint employer status when one entity participated in collective bargaining and occasionally was involved in work assignments relating to the other entity's employees. *AT&T*, 67 F.3d at 451. *See also Int'l House v. NLRB*, 676 F.2d 906 (1982) (no joint employer finding despite one entity exerting control over the hours of operation, product prices, and menus of the other entity, establishing standards of "quality, cleanliness, safety and health" governing the other entity's operations, and possessing the contractual right to approve the other entity's annual budget and inspect its books periodically).

When the Board has found joint employer status, consistent with long settled law, it has required proof of a significant degree of "direct and immediate" control by the putative joint employer over the employees at issue. *See, e.g., In re Aldworth Co.*, 338 NLRB 137, 140 (2002) (finding joint employer status when one entity was involved in decisions relating to employment tenure, discipline, assignment of work and equipment, recognition and awards, and day-to-day direction of the other entity's employees, and also played a "direct and key role in certain events alleged as unfair labor practices in th[e] proceeding."); *Computer Assoc. Int'l, Inc.*, 332 NLRB 1166, 1167 (2000) (finding joint employer status when one entity hired the other entity's employees, exercised day-to-day supervision over them, authorized and rejected overtime for them, and conducted an informal grievance meeting concerning one of them); *In re M.B. Sturgis, Inc.*, 331 NLRB 1298, 1301 (2000) (finding joint employer status when one entity's supervisors assigned, directed, and oversaw the daily work of another entity's employees, had authority to discipline those employees, and were responsible for monitoring the time spent by the other entity's employees, and the contract between the parties afforded one entity control over the other entity's employees' wages and hours of work).

JONES DAY

October 3, 2013
Page 5

In the franchising (and licensing) context, the Board has held repeatedly – both before and after *Browning-Ferris* – that a franchisor (or licensor) is not a joint employer with its franchisee unless the franchisor (or licensor) exerts significant control over the labor relations of its franchisee (or licensee). *See, e.g., Teamsters Local 456 (Carvel Corp.)*, 273 NLRB 516, 520 (1984) (finding that licensee was a neutral third party in a labor dispute involving the licensor notwithstanding the "economic interdependency" between the two of them because the licensor did not exercise control over the licensee's labor relations); *Love's Barbeque Restaurant No. 62*, 245 NLRB 78, 121 (1979) (finding no joint employer relationship where "the only control" that the franchisor exercised over the franchisee was "that necessary to ensure the uniformity of operation and goodwill of the integrated enterprise of which [the franchisee] [was] a part"); *Yellow Cab Co.*, 208 NLRB 1020, 1021 (1974) (finding no joint employer relationship where franchisor "ha[d] no voice or control over wages, hours, and working conditions established by the franchisees" and none of the shared services such as advertising "pertain[ed] to the conduct of labor relations"); *S.G. Tilden, Inc.*, 172 NLRB 752, 753 (1968) (finding no joint employer relationship even though the franchise agreement regulated "many elements of the business relationship" because there was no clear indication that the franchisor "intended to, or in fact did, exercise direct control over the labor relations of [the franchisee]"); *Speedee 7-Eleven*, 170 NLRB 1332, 1334 (1968) (finding that franchisor and franchisee were not joint employers based on the "critical factor" that the franchisor "neither exercise[d] actual, nor possess[ed] potential, control over the store's labor relations under the franchise agreement").

Advice has issued numerous memoranda evaluating the joint employer status of two (or more) entities and never found a joint employer relationship based on facts even remotely close to those here. To the contrary, in an Advice Memorandum considering whether one entity and its former subcontractor were joint employers, the Division reasoned they were not despite facts showing that:

- the entity approved all of the subcontractor's new hires and annual wage rate increases;
- the entity provided the subcontractor with office space and a telephone;
- the entity's management paged the subcontractor's employees on a daily basis to assign them additional tasks and also inspected their work;
- the entity provided the subcontractor's employees with benefits including flu shots, cholesterol screenings, cafeteria discounts, a Christmas party, and occasional free tickets; and
- the entity's owner's Vice President told a bargaining-unit employee of the subcontractor, after a representation petition was filed by one of the subcontractor's employees, that the entity did not plan to renew the subcontractor's contract.

Division of Advice Memorandum, *RVT Maintenance and El Dia, Inc. (EDI)* (Nov. 26, 2002).

·JONES DAY

October 3, 2013
Page 6

When the Division has found joint employer status, it has done so based on facts that fit easily within well-developed Board precedent, such as user-supplier relationships. *See* Division of Advice Memorandum, *DuPont Powder Coatings, Inc.* (Oct. 26, 2006) (finding joint employer status between entity and staffing agency); Division of Advice Memorandum, *Elliott Turbomachinery Co.* (Apr. 1, 2005) (finding joint employer status over leased employees); Division of Advice Memorandum, *St. Louis Electric* (Oct. 15, 2004) (same). *But see* Division of Advice Memorandum, *Transpersonnel, Inc.* (Feb. 27, 2004) (no joint employer status over leased employees). Or, it has done so based on facts that are unique. *See* Division of Advice Memorandum, *Gary Noren Productions* (June 30, 2003) (finding joint employer relationship on one distinct project in television production context).

In a recent Memorandum, the Division found that franchisees of SuperShuttle were independent contractors because, *inter alia*, the franchisor did not exercise "significant control over the manner and means of the [franchisees'] work," a degree of control test similar to that used in the joint employer analysis. Division of Advice Memorandum, *SuperShuttle Los Angeles, Inc.* (May 23, 2013). Advice concluded that SuperShuttle dictated the franchisees' hours of operation, the details of the vans they drove, and the fares they charged; it required franchisees to provide it with advance notice of hiring new employees; it provided direct training to franchisees' employees; it engaged in a "mystery rider" program to evaluate franchisees' performance; and it subjected franchisees to "significant discipline . . . ranging from fines to termination of the [franchise agreement]." *Id.* at 1-4, 7-8. Despite these findings, which go immeasurably beyond any supposed "control" by McDonald's over its franchisees, the Division found that the franchisees were not employees of SuperShuttle because they enjoyed "significant operational freedom".

B.    Under The Board's Current Narrow Standard, McDonald's Is Not a Joint Employer With Its Franchisees And Expansion of the Standard Is Improper.

A conclusion by the Board here that McDonald's is a joint employer with its franchisees would contravene decades of Board precedent. The factual submissions made to the Region by McDonald's to date demonstrate that the oversight retained by McDonald's over its franchisees is limited to that necessary to protect the value of its brand, trade name, and trademarks, and to ensure uniformity of operations across the over 14,000 McDonald's restaurants in the United States. McDonald's does not control – much less exert significant "direct and immediate" control – over the hiring, firing, discipline, supervision or direction of its franchisees' employees. (*See* Affidavit of David Garcia, Exhibit B to McDonald's January 11, 2013 Statement of Position). It does not set the wage rates for franchisees' employees, schedule franchisees' employees for work, approve leave requests, edit or approve their time entries, take part in hiring, firing, or discipline decisions concerning those employees, supervise or assign them daily tasks, or dictate which personnel policies or practices its franchisees implement or how they enforce those policies or practices they choose to implement. *Id.* For the most part,

October 3, 2013
Page 7

McDonald's "direct and immediate" contact with the daily operations of its franchise locations is limited to periodic quality-assurance evaluations. (*See* McDonald's July 5, 2013 & July 25, 2013 Statements of Position). Quite simply, none of the indicia of control established by the Board or courts are present here.

Advice's conclusion in *RVT Maintenance* that joint employer status was inappropriate under prevailing Board law compels a similar result as to McDonald's. Indeed, unlike in *RVT Maintenance*, there is no evidence here that McDonald's approves its franchisees' wage rates or new hires, provides restaurant space to its franchisees free of charge, interacts with franchisees' employees on a daily basis, provides benefits directly to its franchisees' employees, or spoke with any non-supervisory employees of a franchisee about unionization.[3] Likewise McDonald's cannot be found to exert significant control over its franchisees to qualify as a joint employer given the Division's recent opinion that SuperShuttle did not do so. That is, if despite dictating the franchisees' hours of operation, the details of the vans they drive and the fares they charge, requiring franchisees to provide advance notice of hiring new employees, providing direct training to franchisees' employees, engaging in a "mystery rider" program to evaluate franchisees' performance, and subjecting its franchisees to "significant discipline . . . ranging from fines to termination of the [franchise agreement]" SuperShuttle does not exert significant "direct and immediate" control over its franchisees, McDonald's cannot possibly be doing so.

McDonald's does offer training services and optional tools and guidance to its franchisees to assist them in developing sound retail store business practices. But these tools and guidance are perfectly standard – in both substance and scope – in franchise relationships and fall well short of supporting a joint employer finding.[4] (*See* McDonald's March 26, 2013 Statement of Position). And the Board recognizes that "[a] franchisor, wishing to attract franchisees and thus profit from [its] franchise system, may offer certain exclusive services of

---

[3] McDonald's communications with the Regional Leadership Council or individual franchisees who requested information are of no significance. (*See* McDonald's Statement of Position dated March 26, 2013, at 9-10). Indeed, while McDonald's discussed the recent organizing campaign with franchisees generally, there is no evidence that these discussions played any role in the alleged unfair labor practices or that McDonald's required its franchisees to take actions against its employees or adopt or enforce any policies or practices at their restaurants.

[4] "Typically, a franchisor imposes systemwide standards by means of the franchise agreement between the parties that establishes uniform specifications with regard to: advertising and promotion; site selection; construction and design; furniture and fixtures; products and services; cash control; bookkeeping and reporting procedures; general operations; personnel; revenue reports; customer lists; accounting; display of signs and notices; authorized or required equipment, appliances, and appurtenances; required uses of trademark; insurance requirements; license requirements; standards for management and personnel; hours of operation; required uniforms; local advertising; required manner of offering or selling products or services; standards of maintenance and appearance; and training requirements." Kevin M. Shelley & Susan H. Morton, *"Control" in Franchising and the Common Law*, 19 Franchise L. J. 119, 121 (2000)

October 3, 2013
Page 8

one kind or another to [its] franchisees. But, whatever business advantages may be offered to franchisees by franchisors in terms of services rendered to or on behalf of its franchisees, they cannot create the legal relationship of employer-employee as between employees of the franchisees and the management of the franchisor." *Yellow Cab Co.*, 208 NLRB at 1022. *See also Speedee 7-Eleven*, 170 NLRB at 1333 (policy manual that described "in meticulous detail virtually every action to be taken by the franchisee in the conduct of his store" is not evidence of joint employer relationship); *S.G. Tilden, Inc.*, 172 NLRB at 753 ("[t]he offer by [the franchisor] to train prospective employees of the franchisees was an offer to help by [the franchisor] and not the exercise of any authority over [the franchisees'] policies.")

To be sure, it is conceivable that "[t]ypical franchisor controls can look pervasive to judges, lawyers, and jurors who are not schooled in modern franchising." William L. Killion, *Franchisor Vicarious Liability—The Proverbial Assault on the Citadel*, 24 Franchise L. J. 162, 165 (2005). But such oversight of franchisees' operations is necessary to ensure uniformity of operations across the enterprise, the hallmark of modern franchising.[5] Indeed, without uniformity of operations, a franchise system like McDonald's risks devolving into a loosely-connected collection of small business owners. *See* Kevin M. Shelley & Susan H. Morton, *"Control" in Franchising and the Common Law*, 19 Franchise L. J. 119, 121 (2000) ("The uniformity and quality of products offered under a single brand is a prime factor in the success of the franchising concept. Without uniform standards, the franchisees of, say, McDonald's could build and operate units in whatever dissimilar fashions they chose, resulting in different buildings, uniforms, and burgers – and the destruction of the McDonald's concept.")

Federal and state laws and regulations governing franchises also recognize that a degree of involvement by the franchisor is necessary to successful franchising. For example, Federal Trade Commission regulations define a "franchise" as a commercial relationship in which the franchisor "exerts or has the authority to exert a *significant degree of control* over the franchisee's method of operation, including but not limited to, the franchisee's business organization, promotional activities, management, marketing plan or business affairs." 16 C.F.R. § 436.2(a)(1)(B)(1) (2013) (emphasis added).[6] This degree of control also is necessary to ensure

---

[5] "When the customer cannot tell the franchised store from the corporate store, the franchisor has done its job. This is what franchising is all about--finding a business model that works and then insisting that each franchise adhere religiously to the model. The franchisor's tools in achieving this result are its system standards and related operations manual." Killion, 24 Franchise L.J. at 164.

[6] Various state laws also contain a definition of "franchise" that acknowledges the degree of control the franchisor must exert over the franchisee. *See* Illinois Franchise Disclosure Act of 1987, 815 Ill. Comp. Stat. 705/1, *et seq.*; Indiana Franchise Law, Ind. Code §§ 23-2-2.5-1, *et seq.*; Iowa Business Opportunity Promotions Law, Iowa Code §§ 523B.1, *et seq.*; Maryland Franchise Registration and Disclosure Law, Md. Code, §§ 14-20, *et seq.*; Michigan Franchise Investment Law, Mich. Comp. Laws §§ 445.1501, *et seq.*; New York Franchise Act, N.Y. Gen. Bus. Law § 681(3)(a); North Dakota Franchise Investment Law, N.D.. Code §§ 51-19-01, *et seq.*; Oregon Franchise

October 3, 2013
Page 9

that trade names and trademarks are protected. Indeed, the Lanham Act mandates that owners of trademarks, such as McDonald's, must "maintain[] sufficient control of the licensee's use of the mark to assure the nature and quality of goods or services that the licensee distributes under the mark." 15 U.S.C. § 1064(5)(A) (2013). If a franchisor "under-polices" its trademark, then it risks losing its federal registration. *See Cislaw v. Southland Corp.*, 4 Cal. App. 4th 1284, 1295 (Cal. App. 1992) ("A franchisor must be permitted to retain such control as is necessary to protect and maintain its trademark, trade name and good will, without the risk of creating an agency relationship with its franchisees.")

Given decades of precedent supporting the Board's joint employer formulation, to say it would be stunning to McDonald's and the broader franchising community for the Board to expand that formulation now is a significant understatement. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due."); *SEIU Local 32BJ v. NLRB*, 647 F.3d 435 (2d Cir. 2011) ("Where the Board 'departs from prior interpretations of the Act without explaining why that departure is necessary or appropriate,' the Board will have exceeded the bounds of its discretion.") While the Board's current formulation of the joint employer relationship has been criticized by former Board members as being too narrow to reflect modern realities in certain scenarios, the facts of these cases do not at all implicate their concerns. *See In re Airborne Freight Co.*, 338 NLRB at 597 (Member Liebman, in concurring opinion, arguing that the Board should revisit its standard for evaluating joint employer relationships "[g]iven the growing practice in today's economy of contracting out essential functions" of the employment relationship); Craig Becker, *Labor Law Outside the Employment Relation*, 74 Tex. L. Rev. 1527 (1996) (expressing concern that the Board's existing joint employer doctrine would not impose liability on employers who contract out the essential functions of employment (i.e., hiring, firing, supervision, discipline, and direction)). McDonald's, through it franchising operations, does not contract out the essential functions of its employment relationship. Nor is franchising a vehicle for franchisors to outsource work. Therefore, the concern that motivated the positions of former Chair/Member Leibman and Member Becker is not present here. Rather, as has been true for decades, each franchisee is its own, independent business that rises or falls based on many factors, including how successfully it manages employee relations.

---

(continued...)

Transactions Law, 50 Ore. Rev. Stat. 650.005, *et seq.*; Rhode Island Franchise Investment Act, R.I. Gen. Laws §§ 19-28.1-1, *et seq.*; Virginia Retail Franchising Act, Va. Code Ann., §§ 13.1-557, *et seq.*; Washington Franchise Investment Protection Act, Wash. Rev. Code § 19.100.010, *et seq.*; Wisconsin Franchise Investment Law, Wis. Stat. § 553.01, *et seq.*

October 3, 2013
Page 10

Furthermore, as a matter of public policy, the Board should incentivize franchisors to positively influence its franchisees to comply with the law and treat their employees well. This is beneficial to the brand, reduces legal liabilities, and benefits the franchisees' employees. To the extent the Board applies its joint employer framework too broadly, as would be the case here if a complaint issued and joint employer status ultimately found, it will provide a disincentive for franchisors to work with their franchisees on compliance issues out of concern for being labeled a joint employer. The negative impact would be felt across a vast spectrum of employment laws, from Title VII to the Fair Labor Standards Act, because franchisors will move away from providing training and guidance on good employment practices, and potentially implicate common law concerns as well. Obviously, this outcome would be damaging to all involved, including the very constituents the Act is designed to protect.

Finally, recommending an allegation of joint employer status against McDonald's would not only be contrary to existing Board law, but also would contradict decades of federal and state court decisions as well. Since 1985, no fewer than seven courts have held that McDonald's is not a joint employer with its franchisees. *See, e.g., Evans v. McDonald's Corp.*, 936 F.2d 1087, 1089-90 (10th Cir. 1991) (McDonald's not liable to employee of franchisee because there was "no common management, no centralized control of labor relations, and no common ownership or financial control" between McDonald's and franchisee); *Cropp v. Golden Arch Realty Corp.*, No. 2:08-cv-96, at 18 (D.S.C. March 30, 2009) (dismissing wrongful termination claim against McDonald's brought by franchisee's former employee because it was undisputed that the franchisee "was solely responsible for exercising ordinary day to day control over the Restaurant"); *Mosley v. McDonald's Corp.*, No. 05-CV-7290 (N.D. Ill. Dec. 06, 2006) (granting summary judgment to McDonald's Corporation on grounds it was not Plaintiff'' employer under Title VII or Section 1981); *Alberter v. McDonald's Corp.*, 70 F. Supp. 2d 1138, 1144 (D. Nev. 1999) (McDonald's not liable to employee of franchisee because McDonald's and franchisee lacked sufficient interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control); *Dotson v. McDonald's Corp.*, No. 97 C 1833, 1998 U.S. Dist. LEXIS 4676, at *8-9 (N.D. Ill. Mar. 31, 1998) (dismissing claims against McDonald's brought by franchisee's employee); *Kennedy v. McDonald's Corp.*, 610 F. Supp. 203, 205 (S.D. W.Va. 1985) (granting summary judgment for McDonald's on claim by franchisee's employee because franchisee retained power to hire, fire, and discipline plaintiff without needing to consult franchisor); *Lawson v. McDonald's Corporation, et al.*, No. C83-530A (N.D. Ga. 1984) (analyzing discrimination claim using the NLRB's "single enterprise" standard and holding that McDonald's lacked degree of "control" necessary to be jointly liable on plaintiff's claim under Section 1981). *See also Whitfield, et.al v. McDonald's, et.al*, No. 08-118582-NO (Mich. Cir. Ct. July 28, 2010) (granting summary disposition to McDonald's on plaintiffs' claims of refusal to hire under the Elliot-Larsen Civil Rights Act because McDonald's was not proper employer); *Hall v. McDonald's Corporation*, et al., No. 84-270803 (Mich. Cir. Ct. June 22, 1986) (granting summary disposition to McDonald's Corporation on plaintiff's wrongful termination claim because McDonald's was not plaintiff's employer). Conversely, not

JONES DAY

October 3, 2013
Page 11

a single court has found McDonald's to be a joint employer of a franchisee's employees.

## II. A JOINT EMPLOYER ALLEGATION/FINDING WILL HAVE A SIGNIFICANT NEGATIVE IMPACT ON MCDONALD'S.

If Advice finds that the charging party's joint employer allegations should proceed to complaint, this fact, standing alone, will have serious repercussions for McDonald's. There will be uncertainty – likely for years to come – as to whether the fundamental premise upon which the Company was created, and for decades has operated, is viable. Such uncertainty benefits nobody.

Further, if joint employer status were upheld after appeals are exhausted, McDonald's exposure may not be limited to its potential liability under the Act for the actions of its franchisees in these cases. Given that McDonald's is the target of an ongoing nationwide corporate campaign in the fast-food industry, additional charges (regardless of merit) and additional potential exposure are inevitable. Moreover, because the standard for evaluating joint employer status is the same in unfair labor practice proceedings and representation proceedings, McDonald's could conceivably be subject to bargaining obligations in the event one of its franchisee's employees unionized. *Capitol EMI Music*, 311 NLRB 997, 999 (1993), *enf'd.* 23 F.3d 399 (4th Cir. 1994) ("Where such codetermination of terms and conditions of employment of an appropriate unit of employees is shown, the Board finds that the joint employers share an obligation to bargain with a properly designated employee bargaining representative.") With thousands of separate franchise owners throughout the United States, each of which could have one or more separate bargaining units, the potential cost of litigation, liability, and bargaining obligations would be enormous. *Oakwood Care Center*, 343 NLRB 659 (2004) (employees of joint employer and employees of single employer are not part of same bargaining unit, absent consent).

Additionally, a joint employer finding would not only serve as precedent for McDonald's future liability under the Act based on the actions of its franchisees, but also potentially as precedent for liability under other statutes. Thus, some courts have looked to the joint employer test under the Act to evaluate joint employer relationships in connection with state and federal anti-discrimination laws, wage and hour laws, the Worker Adjustment and Retraining Notification (WARN) Act, and other employment laws. *See EEOC v. Pacific Maritime Assn.*, 351 F.3d 1270, 1275-78 (9th Cir. 2003) (discussing joint employer status under NLRA when evaluating claim under Title VII); *Rivas v. Federacion De Asociaciones Pecurias*, 929 F.2d 814, 820 n. 16 & 17 (1st Cir. 1991) (when evaluating claims under ADEA and state discrimination law); *Foy v. Pat Donalson Agency*, No. 2:11-CV-03672, 2013 BL 134753, at *14-18 (N.D. Ala. May 22, 2013) (under FLSA, § 1981, and state laws); *Switalski v. Local Union No. 3 of Int'l Assoc. of Bridge Structural & Ornamental Ironworkers*, 881 F. Supp. 205 , 207-08 (W.D. Pa. 1995) (when evaluating claim under ADA); *Gargano v. Diocese of Rockville Ctr.*, 888 F. Supp.

October 3, 2013
Page 12

1274, 1278 n. 2 (E.D.N.Y. 1995) (when evaluating claim under ADEA and state law, and stating, "cases interpreting employment relationships under the NLRA, such as the concept 'joint employer,' shed light on the issue in this case because they are all determined according to common law principles."); *Am. Fed'n of State Emps., Council 31 v. Illinois State Labor Relations Bd.*, 839 N.E.2d 479 (Ill. 2005) (under Illinois Labor Relations Act); *Borough of Pottstown v. Labor Relations Bd.*, 710 A.2d 641 (Pa. Commw. Ct. 1998) (under Pennsylvania Labor Relations Act). In addition, a joint employer finding would likely have serious common law implications, perhaps especially as to tort claims and with regard to agency principles.

In essence, a joint employer finding will present McDonald's with a Catch-22: either relinquish oversight of its franchisees and risk damage to its brand (and, consequently, its overall profitability) or maintain the same level of oversight of its franchisees and face additional potential exposure for their actions. Regardless of the option it chooses, McDonald's, McDonald's employees, its franchisees, its franchisees' employees and, in turn, the public, lose:

> A company that chooses to franchise gives up its ability to maximize profits by taking a royalty (typically a percentage of the franchisee's sales) in exchange for the franchisee making the capital investment and (assuming the risk of loss) (from expenses exceeding income or from claims by injured or harmed parties). In exchange for its capital investment and assumption of the risk of loss, the franchisee obtains a right to use a business system and the opportunity to maximize its profits. The cost of entry for the franchisee (the franchise fee and royalty stream) reflects an allocation of the risk of third-party liability to the franchisee. Theoretically, if the law ultimately holds franchisors routinely liable for the wrongful acts of their franchisees, franchisors will either quit franchising or at least charge higher fees.

William L. Killion, *Franchisor Vicarious Liability—The Proverbial Assault on the Citadel*, 24 Franchise L. J. 162, 165 (2005). Simply put, McDonald's will be forced to factor potential losses based on future joint employer liability into its business plan. In turn, these actions will lead to a loss of entrepreneurial opportunities (and jobs) across the country and/or a more costly product. *Id.*

## III.   IN CONTRAVENTION OF EXPLICIT BOARD POLICY, A JOINT EMPLOYER FINDING WILL NEGATIVELY IMPACT FRANCHISING OVERALL AND OBSTRUCT THE FREE FLOW OF COMMERCE.

A main object of the Act is to combat obstacles that impede the free flow of commerce. Section 1 of the Act states, "[i]t is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred . . . ." 29 U.S.C. § 151(d)

October 3, 2013
Page 13

(2013).  Given this explicit policy statement, the Act should not be interpreted in a manner that frustrates that end.

The importance of franchises to the U.S. economy is reflected in the numbers.  As of 2012, there were nearly 750,000 franchise establishments in the United States.  IHS Global Insight, *Franchise Business Economic Outlook for 2013*, at 1,7 (December 2012).[7]  These establishments employ about 8.1 million employees and have an output of $769 billion.  *Id.* Franchise establishments account for roughly 3.4 percent of the country's gross domestic product.  *Id.* at 2.  And the economic impact of franchised businesses goes beyond the establishments themselves, because franchises' purchases of products and services, and the personal purchases of franchise owners and employees, also impact non-franchised businesses. PriceWaterhouseCoopers estimated that the total impact of franchising, including its spillover effects, was to add 21 million jobs (or 15.3 percent of all private-sector jobs) and $660.9 billion of payroll (12.5 percent of all private-sector payroll) to the American economy in 2005. PriceWaterhouseCoopers, *The Economic Impact of Franchised Businesses Vol. II: Results for 2005*, at 7.  In addition, the effect of franchises continues to expand.  According to the same report, "output produced because of franchised businesses grew from $1.5 trillion in 2001 to more than $2.3 trillion in 2005; an average growth of 10.9 percent per year.  In 2005, output produced from franchised businesses accounted for 11.4 percent of all private-sector output.  *Id.* at E-1.

Further, there is no question that job creation is essential to the health of the U.S. economy.  Both major political parties made job growth a central tenet of their platforms in the recent presidential election, and for good reason.  By one estimate, the U.S. economy will have to create a net of 21 million new jobs by the end of the decade to reach pre-recession employment levels.  McKinsey Global Institute, *An Economy That Works: Job Creation and America's Future* (June 2011).[8]  Studies show that the best way to create jobs is to encourage enterprise through new businesses and start ups.  Tim Kane, *The Importance of Start-Ups In Job Creation and Job Destruction* (June 2010).[9]  For entrepreneurs seeking to start a new business, franchising offers an established business model and can increase the odds that a new business will not only survive, but thrive and grow.  Chad Moutray, *Linking Franchise Success with Economic Job Growth and Net Job Creation*, at 8 (April 2011).[10]  Indeed, franchised restaurants have greater market value than those that are not franchised.  *Id.*

---

[7] http://www.franchise.org/uploadedFiles/Franchise_Business_Outlook_12-17-2012.pdf (as of Oct. 2, 2013).

[8] http://www.mckinsey.com/insights/employment_and_growth/an_economy_that_works_for_us_job_creation (as of Oct. 2, 2013).

[9] http://www.kauffman.org/uploadedFiles/firm_formation_importance_of_startups.pdf  (as of Oct. 2, 2013).

[10] http://www.franchise.org/uploadedFiles/images/WhitePaperSBLS.pdf (as of Oct. 2, 2013).

JONES DAY

October 3, 2013
Page 14

For many of the same reasons discussed above, even an allegation that McDonald's is a joint employer based on the facts in these cases could have a detrimental impact on franchising throughout the country and, in turn, impede the free flow of commerce.  The necessary involvement by McDonald's in the operations of its franchisees – i.e., enforcing minimum standards to protect its brand and offering optional tools, training, and support to franchisors who need it – is standard fare in franchise operations and critically important to the success of the franchisee; these tools are what separates the franchisee from a typical start-up business.  As one expert on franchising stated in discussing the benefits of franchising to the franchisee:

> The brand creates the demand, allowing the franchisee to initially obtain customers.  The brand includes the franchisor's trademarks and service marks, its trade dress and decor and all of the intangible factors which create customer loyalty and builds brand equity. . . . The ongoing support and training provide the impetus for growth, providing the franchisee with the tools and tips to expand its customer base and build its market share.  The responsibly-built franchise system is one which provides value to its franchisees by teaching them how to get and keep as many customers as possible, who consume as many products and services as possible, as often as possible.

Andrew J. Sherman, Franchising & Licensing: Two Powerful Ways To Grow Your Business In Any Economy at 14 (4th ed. 2011).  If by merely enforcing the standards necessary to protect its brand and operate a successful franchise, a franchisor like McDonald's is alleged to be a joint employer under the Act – or, worse, ultimately found to be a joint employer – the impact on franchisors everywhere will be devastating and, on the economy, only slightly less so.

We believe the above information, together with the information contained in our position statements submitted to the Region, provide the Division with more than ample basis to recommend dismissal of the joint employer allegations against McDonald's.  Please do not hesitate to contact me to discuss this information or any additional questions you may have.  Finally, if Advice is inclined to recommend the issuance of a complaint in this matter as to the joint employer allegations, we would appreciate the opportunity to discuss the cases with you before any action is taken.  Thank you in advance for your attention to this important matter.

Very truly yours,

Willis J. Goldsmith

cc:    Doreen Davis
       Jonathan M. Linas

Exhibit 2



CONFIDENTIAL



2

CONFIDENTIAL

MCDNLRB042810

Exhibit 3



1

CONFIDENTIAL

MCDNLRB042761

Exhibit 4



HIGHLY CONFIDENTIAL